<u>Index of Exhibits</u>

**Exhibit A:**   Verified Shareholder Double Derivative Complaint and Jury Demand, *U.F.C.W. Local 1776 & Participating Employers Pension Fund v. Devitre*, No. 10-cv-01769 (D. Colo.)

**Exhibit B:**   Plaintiff's Response to Order to Show Cause, *U.F.C.W. Local 1776 & Participating Employers Pension Fund v. Devitre*, No. 10-cv-01769 (D. Colo.)

**Exhibit C:**   Affidavit of Eric L. Young in Support of Plaintiff's Response to Order to Show Cause, *U.F.C.W. Local 1776 & Participating Employers Pension Fund v. Devitre*, No. 10-cv-01769 (D. Colo.)

**Exhibit D:**   Copies of all process, pleadings, and orders served upon Defendants in Superior Court action

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

U.F.C.W. LOCAL 1776 & PARTICIPATING EMPLOYERS PENSION FUND, derivatively on behalf of The Western Union Company,

      Plaintiff,

v.

DINYAR S. DEVITRE,
HIKMET ERSEK,
CHRISTINA A. GOLD,
JACK M. GREENBERG,
BETSY D. HOLDEN,
ALAN J. LACY,
LINDA FAYNE LEVINSON,
ROBERTO G. MENDOZA,
MICHAEL A. MILES, JR.,
LORD DENNIS STEVENSON, and
WULF VON SCHIMMELMANN,

      Defendants,

- and -

THE WESTERN UNION COMPANY, and
WESTERN UNION FINANCIAL SERVICES, INC.,

      Nominal Defendants.

---

## VERIFIED SHAREHOLDER DOUBLE DERIVATIVE COMPLAINT AND JURY DEMAND

---

Plaintiff, by its attorneys, alleges for its Verified Shareholder Double Derivative Complaint, upon personal knowledge as to itself and its own actions, and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through its attorneys, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder double derivative action seeking injunctive and other relief on behalf of Nominal Defendants The Western Union Company ("WUC") and its wholly owned subsidiary Western Union Financial Services, Inc. ("WUFSI") (collectively, the "Company"). The action arises from violations of fiduciary duty owed to the Company by its directors and/or officers. These violations, in turn, have substantially injured the Company.

2.      As detailed herein, the Individual Defendants (as defined herein) consciously and systemically failed to implement and oversee the Company's compliance with applicable anti-money laundering ("AML") laws, regulations, and rules known to them, including but not limited to the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 *et seq.*, and A.R.S. § 13-2317, that caused substantial losses to the Company beginning on September 29, 2006 through December 31, 2007 (the "Relevant Period"). The Company and the Individual Defendants knew about these requirements but ignored them with catastrophic financial results to the Company.

3.      The unlawful and systemic course of misconduct by the Company and the Individual Defendants spawned a Settlement Agreement dated February 11, 2010, with the Arizona Attorney General (in cooperation with the Attorneys General for the States of California, New Mexico, and Texas) (the "Settlement Agreement") in which the Company agreed to pay $94 million to resolve all potential regulatory, civil, and criminal claims arising from certain conduct specified in the Settlement Agreement involving payments tied to money laundering violations that facilitatedhum an smuggling from Mexico into the United States through Arizona, all of which could, and should, have been prevented had the Individual Defendants complied with their fiduciary duties. Among other things, human smuggling of illegal immigrants from Mexican and Central American locations has substantial negative effects

on efforts to improve working conditions for all members of the United States workforce. The Settlement Agreement and its exhibits are fully incorporated herein by this reference.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States and foreign states. This action is not brought collusively to confer jurisdiction on this Court.

5.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' (defined below) participation in the wrongful acts detailed herein, occurred in this District, and WUC and WUFSI maintain their corporate headquarters in this District. Further, Defendants reside in or maintain executive offices in this district, and/or have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this District.

## PARTIES

### Plaintiff

6.      Plaintiff U.F.C.W. Local 1776 & Participating Employers Pension Fund ("Plaintiff") is, and was at all times during the Relevant Period, a shareholder of the Company. Plaintiff brings this action derivatively in the right of and for the benefit of the Company. Plaintiff will fairly and adequately represent the interests of the Company and the shareholders of the Company in enforcing the rights of the Company. Plaintiff has verified this complaint, including that it was a shareholder at the time of the conduct at issue. A copy of the verification is attached hereto as Exhibit 1. Plaintiff is a citizen of New Jersey and Pennsylvania.

**Nominal Defendants**

7.      Nominal defendant WUC is incorporated in the state of Delaware and has its principal executive offices located at 12500 East Belford Avenue, Englewood, Colorado 80112. WUC and its subsidiaries provide global money transfer and payment services to individuals and businesses. WUC shares are traded on the New York Stock Exchange under the symbol "WU."

8.      Nominal Defendant WUFSI is a Colorado corporation with its principal executive offices located at 6200 South Quebec Street, Greenwood Village, CO 80112. WUFSI is a financial services company whose primary business involves transmitting money sent by one person to another person through interstate and/or foreign commerce via interstate or international wire. WUFSI is a wholly owned subsidiary of WUC.

**Current Director Defendants**

9.      Defendant Dinyar S. Devitre ("Devitre") is and has been a WUC director since 2006. According to the Company's website, Devitre currently serves as Chairperson for the Company's Audit Committee. Devitre is a citizen of New York.

10.     Defendant Hikmet Ersek ("Ersek") has been a WUC director since April 26, 2010, according to a Company press release attached to a Form 8-K filed with the United States Securities and Exchange Commission ("SEC") on April 27, 2010. Ersek has been WUC's Chief Operating Officer ("COO") since January 2010, after serving as Executive Vice President and Managing Director for Europe, the Middle East, Africa, and the Asia Pacific region. WUC announced its intention for Ersek to replace Individual Defendant Gold as President and Chief Executive Officer ("CEO") effective September 1, 2010. Ersek is a citizen of Austria.

11.     Defendant Christina A. Gold ("Gold") has served as a director, President, and CEO of WUC since 2006. According to the Company's website, prior to these positions, Gold

- 4 -

served as a Senior Executive Vice President of First Data Corp.[1] and President of WUC from May 2002. Gold has announced her intention to retire effective September 1, 2010. Gold is a citizen of Colorado.

12.   Defendant Jack M. Greenberg ("Greenberg") is and has been a director of WUC since 2006 and is currently its Non-Executive Chairman of the Board. According to the Company's website, Greenberg served as a director of First Data from 2003 to 2006. Greenberg is a citizen of Illinois.

13.   Defendant Betsy D. Holden ("Holden") is and has been a director of WUC since 2006. According to the Company's website, Holden is a member of the Corporate Governance ("CG") Committee and the Compensation and Benefits Committee. Holden is a citizen of Illinois.

14.   Defendant Alan J. Lacy ("Lacy") is and has been a director of WUC since 2006. According to the Company's website, Lacy is currently Chair of the CG Committee and a member of the Audit Committee. Lacy is a citizen of Illinois.

15.   Defendant Linda Fayne Levinson ("Levinson") is and has been a director of WUC since 2006. According to the Company's website, Levinson is currently Chair of the Compensation and Benefits Committee and a member of the Audit Committee. Levinson is a citizen of California.

16.   Defendant Roberto G. Mendoza ("Mendoza") is and has been a director of WUC since 2006. According to the Company's website, Mendoza is a member of both the Audit Committee and the Compensation and Benefits Committee. Mendoza is a citizen of New York.

17.   Defendant Michael A. Miles, Jr. ("Miles") is and has been a director of WUC

---

[1] The Company was spun off from First Data as an independent entity on September 29, 2006, and is no longer affiliated with First Data.

- 5 -

since 2006. According to the Company's website, Miles is a member of the CG Committee. Miles is a citizen of Massachusetts.

18.     Defendant Lord Dennis Stevenson ("Stevenson") is and has been a director of WUC since 2006. According to the Company's website, Stevenson is a member of both the CG Committee and the Compensation and Benefits Committee. Stevenson is a citizen of the United Kingdom.

19.     Defendant Wulf von Schimmelmann ("von Schimmelmann") is and has been a director of WUC since 2009. According to the Company's website, von Schimmelmann is a member of both the CG Committee and the Compensation and Benefits Committee. Upon information and belief, von Schimmelmann is also a member of the board of directors of WUFSI. von Schimmelmann is a citizen of Germany.

20.     The defendants listed in paragraphs 9 through 19 shall be referred to as the "Individual Defendants" and collectively, with the Nominal Defendants, shall be referred to as "Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

21.     The Individual Defendants, because of their positions of control and authority as directors or officers of the Company, were able to and did, directly and indirectly, control or fail to control the wrongful acts complained of herein. Because of their directorial and executive positions with the Company, each of the Individual Defendants had access to adverse non-public information about the financial condition and operations of the Company, including, without limitation, the misconduct of the other Individual Defendants.

22.     At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within

the course and scope of said agency.

23.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial, business, and corporate affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required, among other things, to:

    a.     Manage, conduct, supervise, and direct the business affairs of the Company in accordance with the laws of the United States, the states in which it conducted business, and the Company's charter and bylaws;

    b.     Implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable federal and state laws, rules, and regulations; and

    c.     Refrain from using their status as directors or officers to the detriment of the Company and its shareholders.

24.     Certain Individual Defendants assumed additional fiduciary duties in connection with their service on the WUC Board's Audit Committee, duties which they were required to exercise with loyalty and in good faith.  According to its charter, the Audit Committee "assist[s] the Board of Directors in fulfilling its oversight responsibilities with respect to," among other things, "the Company's compliance with legal and regulatory requirements."  The Audit Committee members are required to, among other things, "[a]s appropriate, review and direct the investigation of possible violations of law and of the Company's Code of Conduct, retain outside counsel and other experts to assist in such investigations and direct that appropriate remedial steps are taken if such violations are detected," as well as "[r]eport the activities of the

Committee to the Board of Directors on a regular basis and review issues with the Board as the Committee deems appropriate."

25.     As alleged herein, each of the members of the Audit Committee violated their duties as members of the committee in that they consciously and systemically failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable laws, rules, and regulations, especially high risk, high profile laws such as those pertaining to AML.

26.     Certain Individual Defendants assumed additional fiduciary duties in connection with their service on the WUC Board's CG Committee.  According to its charter, the CG Committee, among other things, "review[s] and advise[s] the Board regarding matters of public policy and social responsibility as they relate to the Company."  Its members are required to, among other things, "[r]eview the Company's compliance programs and policies relating to anti-money laundering laws, including investigations or other matters that may arise in relation to such laws."  In addition, "periodically, but not less frequently than annually, the Chairperson of the Committee, or his or her designee, shall provide reports to the Audit Committee of the Board as to the status of and developments in this area."

27.     As alleged herein, each of the members of the CG Committee violated their duties as members of the Committee in that they consciously and systemically failed to implement and oversee in good faith, and with loyalty, adequate controls sufficient to monitor and prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable AML laws, rules, a nd regulations.

## SUBSTANTIVE ALLEGATIONS

### Background

28.     According to WUC's Form 10-K filed with the SEC on February 26, 2010 (the

"2010 10-K"):

> Individual money transfers from one consumer to another are the core of our
> business, representing 85% of our total consolidated revenues for 2009. We offer
> consumers a variety of ways to send money. . . . [M]ost remittances are sent in
> cash at one of our more than 410,000 agent locations worldwide. . . . We also
> offer consumers several options to receive a money transfer. . . . [T]he vast
> majority of transfers are paid in cash at agent locations . . : .
>
> \*                    \*                    \*
>
> Our revenue is derived primarily from transaction fees charged to consumers to
> transfer money. In money transfers involving different send and receive
> currencies, we also generate revenue based on the difference between the
> exchange rate set by Western Union to the consumer and the rate at which we or
> our agents are able to acquire currency.
>
> In a typical money transfer transaction, a consumer goes to one of our agent
> locations, completes a form specifying, among other things, the name and address
> of the recipient, and delivers it, along with the principal amount of the money
> transfer and the fee, to the agent. This sending agent enters the transaction
> information into our money transfer system and the funds are made available for
> payment, usually within minutes. The recipient enters an agent location in the
> designated receiving area or country, presents identification and is paid the
> transferred amount. Recipients do not pay a fee. . . . We determine the fee paid by
> the sender, which generally is based on the principal amount of the transaction
> and the locations to and from which the funds are sent and are to be transferred.
>
> \*                    \*                    \*
>
> *Over 85% of our consumer-to-consumer transactions involve at least one non-*
> *United States location.*
>
> \*                    \*                    \*
>
> *We offer money transfer services worldwide. In 2009, over 95% of our consumer-*
> *to-consumer transactions were cash money transfers involving our walk-in agent*
> *locations around the world. . . .*
>
> \*                    \*                    \*

> Walk-in money transfer service. *The majority of our remittances constitute transactions in which cash is collected by the agent and payment (usually cash) is available for pick-up at another agent location in the designated receive location, usually within minutes. . . .*

(Emphasis added).

29.     The Company operates in a heavily regulated environment.   As the Company acknowledged in the 2010 10-K:

> Another significant trend impacting the money transfer industry is the increase in regulation in recent years. Regulation in the United States and elsewhere focuses, in part, on anti-money laundering and anti-terrorist activities. Regulations require money transfer providers, banks and other financial institutions to develop systems to detect, monitor and report certain transactions.
>
> *           *           *
>
> Our money transfer and money order services are subject to anti-money laundering laws and regulations, including the Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001 (collectively, the "BSA") and similar state laws and regulations. The BSA, among other things, requires money transfer companies and the issuers and sellers of money orders, to develop and implement risk-based anti-money laundering programs, report large cash transactions and suspicious activity, and in some cases, to collect and maintain information about consumers who use their services and maintain other transaction records. Many states impose similar and, in some cases, more stringent requirements. These requirements also apply to our agents. In addition, the United States Department of the Treasury has interpreted the BSA to require money transfer companies to conduct due diligence into and risk-based monitoring of their agents inside and outside the United States.

30.     On February 11, 2010, the Attorney General of the State of Arizona announced the Settlement Agreement with WUFSI resulting from WUFSI's request for "a global resolution of all potential regulatory, civil, and criminal actions that could arise from conduct described in" a "Statement of Admitted Facts" attached as Exhibit A to the Settlement Agreement.  Settlement Agreement, ¶ 4.  The Settlement Agreement was prompted by, among other things, alleged violations of Arizona's AML statute, A.R.S. § 13-2317.

31. The Settlement Agreement ended litigation between Arizona and WUFSI beginning in 2006, after the State directed WUFSI to produce data reflecting any wire transfers in an amount of $300 or more to any location in the State of Sonora, Mexico from any Company location worldwide for a three-year period and obtained warrants authorizing seizure for forfeiture of certain transfers sent to or from Arizona, as well as transfers from twenty-eight states other than Arizona to twenty-six locations in Sonora.

32. The Settlement Agreement and the Statement of Admitted Facts acknowledged that WUFSI "has specific duties imposed by federal and state law to develop, implement, and maintain an effective [AML] program and to comply with various record keeping and reporting requirements that are designed to assist governmental agencies in detecting and preventing money laundering" and had "developed and implemented a risk-based . . . AML compliance program that is designed to prevent, detect, and report potential money laundering activities." Settlement Agreement, ¶ 3; *Id.,* Exh. A, ¶ 2. However, its AML compliance program clearly was deemed insufficient, because WUFSI agreed to pay $23 million to enhance its AML program *and* to be subject to an independent Monitor. *See infra.*

33. In the "Statement of Admitted Facts," Exh. A to the Settlement Agreement, WUFSI admitted, among other things, that:

> a.    Between 2003 and 2007, *it had data and other information available to it,* which, when viewed as a whole, *gave it reason to know that one or more persons employed at the authorized delegate locations in Arizona* referred to in paragraph b. below, and at the locations referred to in paragraph d. below, *while acting within the scope of their employment and motivated at least in part to benefit WUFSI, were knowingly engaged in a pattern of money laundering violations that **facilitated human smuggling** from Mexico into the United States through Arizona.*

> b.    From 2003-2005 the WUFSI payouts at the eight Arizona locations listed below totaled $176,735,000 in wires of $500 or more sent to the location from one of the 29 States that were the most frequent destinations for ***persons***

*being smuggled from Mexico into the United States through Arizona.* These amounts include both legal and illegal transactions.

> Location A $34,825,000
> Location B $28,706,000
> Location C $28,428,000
> Location D $18,892,000
> Location E $18,702,000
> Location F $16,567,000
> Location G $15,507,000
> Location H $15,108,000

      c.      Beginning in 2006, WUFSI limited money transfer transactions into Arizona to a maximum of $450. Because *smuggling into the United States through Arizona continued, smugglers had their payments wired to other places outside the United States.*

      d.      From 2005-2007, WUFSI payouts at the following eight locations outside the United States totaled $142,446,000 in wires of $500 or more sent to the location from one of the 29 States that were *the most frequent destinations for persons being smuggled into the United States through Arizona.* These amounts include both legal and illegal transactions.

> Location I $36,200,000
> Location J $20,666,000
> Location K $20,069,000
> Location L $19,872,000
> Location M $18,141,000
> Location N $14,654,000
> Location O $ 6,664,000
> Location P $ 6,180,000

*Id.,* Exh. A, ¶¶ 4-7 (emphasis added).

34.      WUFSI "accepted and acknowledged its responsibility for its conduct as set forth in the Statement of Admitted Facts." Settlement Agreement, ¶ 6.

35.      In order to settle any forfeiture claims the State of Arizona may have against WUFSI, as well as any other potential regulatory, civil and criminal claims or actions that could arise from the Statement of Admitted Facts, WUFSI agreed:

      a.      To pay the State of Arizona $21 million to reimburse the State for its costs and expenses of prosecution and investigation;

b.      To pay $23 million for non-law enforcement expenses associated with enhancing its AML Program for the Southwest Border Area ("SBA")[2] and to implement the recommendations of a Monitor whom it was agreeing to fund from that amount;

c.      To pay $50 million to the State Center, a 501(c)(3) entity, to establish an SBA Anti-Money Laundering Alliance Fund to make grants to law enforcement organizations in Arizona, California, New Mexico, and Texas to combat money laundering and related criminal activity in the SBA;

d.      To full compliance with applicable state law and the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 through 5330, and all of its implementing regulations with respect to the SBA. Further, to comply with the BSA, A.R.S. §§ 6-1241 and 13-2317, and the Settlement Agreement, WUFSI agreed to continue to adhere to its BSA/AML program measures in existence or in the process of being implemented in the SBA, as described in the KPMG Report, consistent with the principles set forth in the Financial Action Task Force[3] Risk-Based Approach Guidance relating to money services businesses, and to implement additional program measures recommended by an independent Monitor in the SBA;

e.      With respect to transactions that are sent from or received in the SBA, to in all material respects completely, fully, and timely comply with all legal, record keeping, and reporting obligations imposed on it by applicable state law; by the BSA and the BSA's implementing regulations; and by the requirements of the Settlement Agreement, including, but not limited to, its obligation to maintain its AML Program for the SBA and implement additional Program measures recommended by the Monitor in the SBA;

f.      To be overseen by an independent Monitor for at least 29 months and no more than 41 months after the Settlement Agreement is executed.  The Monitor is required to evaluate WUFSI's compliance with its obligations under this Agreement and the Engagement Letter attached as an exhibit thereto, review and monitor the effectiveness of WUFSI's risk-based AML compliance Program for the SBA, and make such recommendations as the Monitor believes may improve the Program, as provided in the Engagement Letter.

*Id.,* ¶¶ 8-9, 16, 17.2, 19, 21-23.

36.     The Engagement Letter described in detail the Monitor's functions, which

_____

[2] The SBA is defined as "all of Arizona and the area within 200 miles north and south of the United States/Mexico border." Settlement Agreement, ¶ 3.

[3] The Financial Action Task Force is an international intergovernmental body established in 1989 at the G-7 Summit. See www.fatf-gafi.org/dataoecd/43/46/38960576.pdf.

- 13 -

include:

    a.    Conducting an Initial Review of WUFSI's AML program in the SBA;

    b.    Reviewing WUFSI's risk assessment that it must prepare under the Engagement Letter;

    c.    Evaluating WUFSI's SBA AML Program functions;

    d.    Evaluating WUFSI's SBA AML Program integrity (including whether WUFSI "designates an individual or individuals at the executive level with responsibility for the Program, [and] provides such individual(s) with appropriate reporting lines within the corporate structure and sufficient access to [its] Board of Directors");

    e.    Issuing an Implementation Plan and making recommendations reasonably designed to implement or improve the SBA AML integrity program;

    f.    Investigating potential breaches of the Settlement Agreement and the AML laws in the SBA;

    g.    Preparing periodic reports monitoring and evaluating compliance with Engagement Letter; and

    h.    Preparing a final report.

*Id.*, Exh. B, ¶¶ 13, 15-20, 27-28, 30-31.

37.    The Settlement Agreement recognized that WUFSI had an existing AML program that was "designed to prevent, detect, and report potential money laundering activities." Moreover, it had "dedicated substantial resources to, among other things: developing transaction monitoring systems to detect potentially suspicious activity; building a team of AML professionals; screening, training, and monitoring its Agents; producing AML policies and manuals; and implementing compliance measures" in the SBA. Settlement Agreement, ¶ 3.

38.    The Engagement letter also acknowledged that WUFSI had a "large and complex" BSA AML compliance program that spans all of its locations, including the SBA. Settlement Agreement, Exh. B, ¶ 1.

39.  The Statement of Admitted Facts even stated that "*any* reasonably applied controls, including controls implemented as a result of a reasonably implemented risk-based approach, will not identify and detect all instances of money laundering." Settlement Agreement, Exh. A, ¶ 3.

40.  Nevertheless, the Company's AML program was insufficient to avoid nearly $100 million in sanctions per its agreement with the Arizona Attorney General because WUFSI had "*reason to know* that one or more persons employed at the authorized delegate locations in Arizona" specified in the Statement of Admitted Facts and "at the [other] locations referred to" therein "*while acting within the scope of their employment and motivated at least in part to benefit [WUFSI], were knowingly engaged in a pattern of money laundering violations that facilitated human smuggling from Mexico into the United States through Arizona,*" *id.,* exh. A, ¶ 4, yet allowed such reprehensible, immoral, and illegal conduct to occur.

41.  On December 23, 2008, nearly a year after the Relevant Period ended, the Company retained KPMG LLP to evaluate its BSA/AML compliance program. "Report on Assessment of BSA/AML Money Transfer Compliance Program" (the "KPMG Report"), May 8, 2009, at 3. "KPMG was asked to focus on the BSA/AML compliance internal control structure applicable to the Company's operations and Agent networks in North America and Mexico, specifically." *Id.,* at 4. "Moreover, and in part as a result of regulatory scrutiny and heightened media attention to illegal activity associated with the [SBA], such as drug trafficking and human smuggling, [the Company] asked KPMG to pay particular attention to AML program elements that have been implemented to address the risks associated with these issues." *Id.* KPMG was also requested "to focus exclusively on [the Company's] money transfer services." *Id.*

42.  The KPMG Report confirmed that the Company only "[r]ecently" became

- 15 -

focused on the SBA in general, and human trafficking in particular, with especial emphasis placed on Arizona. It stated that:

> Western Union has enacted more stringent controls on transactions going into or out of Arizona. Money transfer transactions into Arizona have been limited to a maximum of $450[4]a nd all transactions of $1 or more that originate from or are paid in Arizona are reviewed by WireWatch+.[5]   Special business rules in WireWatch+ with lower thresholds are also being used to monitor for potentially suspicious activity in Arizona.[] Additionally, manual transaction monitoring is also performed, with a regular examination of an Arizona Spike Report, designed to detect abnormal increases in activity.

*          *          *

> [T]here are also plans to add a new front-end consumer matching program called Galactic ID[] to Arizona point-of-sale systems. This IBM E[ntity]A[nalytic] S[olutions] tool will create consumer matching, then RTRA, a Western Union proprietary system, will utilize Galactic ID to aggregate activity and apply tailored business rules thereto. Once implemented in conjunction with the Real Time Risk Assessment system Arizona will become the first U.S. state where Western Union will have the ability to freeze suspicious transactions before they are processed. It is anticipated that the program will launch in early 2009.

> Western Union initiated a new program in *September of 2006,* applicable to all Southwest Border States, whereby consumers would be required to provide a valid U. S. Government issued identification document for all transactions that require a Social Security Number made within 200 miles of the Mexican border. This additional identification requirement is designed to mitigate additional risks identified, such as the risk that consumers are providing false identification information or that Western Union's services could be being used to conduct "coyote" transactions. Affected Agents were notified of this new requirement by Western Union in writing, via a letter that specified, among other things, that "effective immediately, consumers must present an acceptable form of U.S. government-issued ID when also presenting a U.S. Social Security Number (SSN) for Receive transactions of $500 or more, or Send transactions of $1,000 or more." Notification letters, which required immediate compliance from the

---

[4] According to the KPMG Report, "[t]he $450 limit was put in place to ensure that Western Union could meet the Arizona Department of Financial Institution's directive that Agents cease violating the AZ Attorney General's Geographic Targeting Orders (GTOs). Since the GTOs had a threshold of $500, Western Union implemented a lower threshold of $450 so Agents would not be paying out any transactions that could be subject to the GTO." KPMG Report, at 63 n.149.

[5] "WireWatch+ is Western Union's proprietary transaction monitoring application. WireWatch+ is a rules-based application used to monitor all money transfer transactions. Among other things, the application identifies potentially suspicious activity and generates alerts, which are forwarded to the Research and Reporting group for analysis." KPMG Report, Appendix A.

Agents upon receipt, were first sent out in March of 2007 and included all new Arizona-based Agents, followed by all new Agents located within 200 miles of the Mexican border, including California, New Mexico, and Texas.

*Id.,* at 63-64 (footnotes omitted; emphasis added).

43.  The facts that the Company "recently" became interested in the SBA and Arizona, limited money transfer into Arizona *beginning in 2006* to a maximum of $450, Settlement Agreement Exh. A, ¶ 6, and initiated a new SBA identification program in September 2006 were all related to actions threatened by the Arizona Attorney General in 2006, including demands for information about send and receive transactions originating and terminating in Senora and seizure of all money transfers from twenty-eight U.S. states to Sonora (not including Arizona) beginning the week of *September* 18, 2006, and all Mexico-bound transfers from targeted U.S. jurisdictions if the sender requested any change, refund, or cancellation.

44.  As was the case in the Settlement Agreement, KPMG found that the Company had "established a well-formed, well-documented risk-based AML Program." KPMG Report, at 6. It had even "implemented enhanced compliance measures to address its higher risk areas" such as the SBA. *Id.,* at 7.

45.  Nevertheless, KPMG identified *twenty-six* separate recommendations for enhancements to the Company's AML program. *Id.,* at 9. It summarized them as follows:

Specifically, we have identified a few recommendations which may enhance the current program's more reactive approach (i.e., with more emphasis on addressing audit and/or regulatory findings) with a more proactive approach (i.e., attempts to identify and address industry trends, regulatory expectations, and audit issues in advance) regarding certain aspects of the program. This may result in a more holistic and strategic effort and allow the Program to continue to meet industry standards for the foreseeable future. For example, KPMG recommends analyzing individual AML risk assessment components in the aggregate to determine how their correlation with one another may further raise or lower overall risk levels and how this information can be leveraged for other program elements (e.g., transaction and/or Agent monitoring). Other recommendations include, but are not limited to, ensuring certain processes and additional compliance measures that

- 17 -

have already been implemented in practice are properly documented (such as ongoing reporting to senior management); considering the creation of a formal oversight committee, which includes management across all relevant functions to avoid the potential for communication gaps, duplication of efforts, and to allow for streamlining across projects and resources; the development of detailed action plans to describe ongoing initiatives and track progress relating thereto; and implementing a more formal schedule for ongoing tuning and testing of transaction monitoring application rules and parameters.

*Id.*, at 7-8 (footnote omitted).

46.     The KPMG Report stated that WUC's Board *"must invariably . . . be familiar with the BSA/AML internal control structure that has been implemented to ensure compliance." Id.,* at 12 (emphasis added). Having said this, it found that the Board was barely, rather than invariably, familiar with the Company's BSA/AML structure. The Report determined that the Board only approves the Company's "Global AML Policy Statement" and revisions thereto; it *does not* approve the Company's "U.S. BSA/AML Manual." *Id.,* at 14. Thus, to paraphrase the words of the Company's consultant, the Board is not "invariably familiar" with the Company's "BSA/AML internal control structure that has been implemented" and is in no position to ensure that the Company is in compliance with applicable requirements.

47.     The KPMG Report also determined that neither the Board nor the Company's Chief Compliance Officer are required to review the "standards, guidelines and procedures [developed to] provide further clarification, application and interpretation of the AML policies." *Id.* (brackets in original).

48.     The Board has thus utterly and systemically abdicated its responsibilities for implementing and overseeing the Company's AML compliance program and procedures.

49.     The KPMG Report noted that "the success of [the Company's] AML Program, as with any AML Program, depends to a large extent on the effectiveness of ongoing communication between and among *the Board,* senior management, Company employees at all

levels (particularly those with compliance responsibilities), Agents, regulators, and law enforcement." *Id.,* at 17 (emphasis added; footnote omitted). It added that "organizations with AML Programs that exceed industry standards have generally implemented a formal process for reporting information related to regulatory examination findings, AML Program developments, changes in the Company's risk profile, or the like, *to members of the Board* and senior management on an ongoing basis." *Id.* (emphasis added). It then discussed employees' understanding of their roles and responsibilities, and the Company's compliance culture and dedication to improving its AML program, but made no mention of the Board's understanding thereof or involvement therein. *Id.,* at 17-18.

50.     The KPMG Report posited that the Company has "appropriately developed a variety of templates/tools specifically designed to keep senior management and/or the Board abreast of changing program risks and mitigating controls" in that "both the Chief Compliance Officer and Senior Vice President (SVP) of Global Service Support (GSS) receive reports from their subordinates that are relevant to the specific functions they oversee." *Id.,* at 19. It summarized that "[w]hile it is clear that in practice updates on compliance issues are provided to senior management and/or the Board on a periodic basis, **these efforts are not reflected in either the *Global AML Policy Statement* or *U.S. BSA/AML Manual*** and should be documented to foster greater sustainability and accountability." *Id.* (emphasis added). Moreover, it gave no specific indication that such information is ever provided to the Board.

51.     The KPMG Report found that while the "Board is responsible for designating a qualified individual responsible for coordinating and monitoring day-to-day BSA/AML compliance," it "remains ultimately responsible for BSA/AML compliance and, thus, must play an integral role in the oversight of the AML Program through active monitoring of its

effectiveness." *Id.,* at 20.   As evidence of the Board's compliance, it said:

> the *Global AML Policy Statement* spe cifies that the "Western Union Global AML
> Policy is to receive annual Board approval;" and the *U.S. BSA/AML Manual*
> further states that Western Union's AML Program includes "an ongoing review of
> existing policies, procedures and internal controls, and Sr. AML Compliance
> Management and/or Western Union Board approval of the policies and
> procedures when changes of a significant nature have occurred."

*Id.*   Nevertheless, as noted above, the Board does not review or approve changes to AML

policies and procedures, leaving them to lower level employees.

52.   The Report stated that the Company "is required by regulation to independently

test its AML Program to ensure that it has been implemented and is operating effectively." *Id.,*

at 24.  Such testing is done annually by the Company's Internal Audit department.  "The results

of these reviews are communicated to the Chief Compliance Officer and to other members of

senior management as applicable," but there is no indication they are reported to the Board. *Id.*

53.   As such, the KPMG Report made an affirmative recommendation that:

> To promote continued and sustainable accountability, [the Company] should
> consider updating the *Global AML Policy Statement* and *U.S. BSA/AML Manual*
> to reflect (at a minimum via an overview) the reporting measures which are
> already occurring in practice to ensure that senior management *and/or the Board*
> *stay apprised of significant changes to Western Union's BSA/AML Program,*
> *relevant regulatory developments, examination and/or internal audit findings*
> *(if any), and/or changes in the Company's BSA/AML risk profile (among other*
> *things).* Moreover, it is the Chief Compliance Officer's responsibility to ensure
> that such reporting is timely and ongoing and, as such, should also be included in
> the roles and responsibilities section of both documents.

*Id.,* at 25 (emphasis added).

54.   The KPMG Report made twenty-five other specific recommendations to improve

the Company's BSA/AML money transfer compliance program.   A number were of such

consequence that they cast doubt on the Report's ultimate conclusion that the Company "has

established a well-formed, well-documented risk-based AML Program." *Id.,* at 6.

55.     Among the more significant recommendations made by KPMG:

● It appears that transaction monitoring is tested and/or tuned in reaction to regulatory or Internal Audit findings. . . . *[T]hresholds should be tested and tuned on a regular and more proactive basis.* The results of these tuning exercises should be documented. *It appears this is more often performed in reaction to regulatory or Internal Audit pressure instead.*

*          *          *

● Western Union should determine whether more periodic analysis and tuning of the decision matrices used by Analysts to conduct investigations of potentially suspicious activity could identify new efficiencies in the process and avoid unnecessary SAR [Suspicious Activity Report] filings (i.e., by more effectively determining whether unusual activity is in fact suspicious).

*          *          *

● In line with its commitment to implementing an AML Program that exceeds industry standards, *Western Union should enhance existing SAR policies and procedures to describe the possible repercussions against Agents and/or types of measures taken in response to repeated SAR filings. At a minimum, existing policies and procedures should specify whether an Agent relationship can be terminated as a result of SAR filings, and whether controls can be put in place to limit the extent to which an Agent is authorized to sell Western Union services and products when a related issue has been identified and not yet resolved.*

KPMG Report, at 66, 71-72 (emphasis added).

56.     These findings demonstrated that, among other things, the Company's AML program was reactive, not proactive, in the critical area of transaction monitoring; it lacked critical quality controls with regard to SAR filing; and that its policies and procedures were deficient concerning consequences to Agents as a result of repeated SAR filings. None of this would have been known by the Board because it had disengaged itself from the creation and implementation of the Company's AML program, save for its desultory approval of its Policy Statement.

57.     The complete lack of attention to the Company's AML Program by the Board

- 21 -

described above is particularly egregious in light of the duties of the Audit Committee to "assist the Board of Directors in fulfilling its oversight responsibilities with respect to . . . the Company's compliance with legal and regulatory requirements," and the duties of the CG Committee to "[r]eview the Company's compliance programs and policies relating to anti-money laundering laws . . . and periodically, but not less frequently than annually, [to require] the Chairperson of the Committee, or his or her designee, [to] provide reports to the Audit Committee of the Board as to the status of and developments in this area."

## DEMAND IS FUTILE

58.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company because of breaches of fiduciary duty by the Individual Defendants.

59.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.  This action is not a collusive one designed to confer jurisdiction on this Court that it would otherwise not have.

60.     Plaintiff is the owner of WUC common stock and was the owner of such shares at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

61.     Plaintiff has not made a demand on the Board of Directors to bring this cause of action because such a demand would be futile.  Currently, the Company's Board consists of eleven members:   Individual Defendants Devitre, Ersek, Gold, Greenberg, Holden, Lacy, Levinson, Mendoza, Miles, Stevenson, and von Schimmelmann.  As discussed in detail below, a majority of the current directors, *i.e.,* at least six of the eleven Board members at the time this complaint was filed, have specific personal conflicts of interest or have demonstrated their individual inability to act independently and impartially.

A.    **Company Officers—Individual Defendants Gold and Ersek**

62.    Individual Defendant Gold has been the President and CEO of WUC since 2006, and was a Senior Executive Vice President of First Data, and President of WUC, beginning in May 2002.  According the Company's DEF 14A filed with the SEC on March 30, 2010 (the "Proxy Statement"), Individual Defendant Gold earned $2,349,750 (base salary and Annual Incentive Plan award) in 2009, plus 168,635 restricted stock unit "career shares" with a grant date value of $2 million.

63.    Individual Defendant Ersek has been COO of WUC since January 2010, after serving as Executive Vice President and Managing Director for Europe, the Middle East, Africa, and the Asia Pacific region, and he will become President and CEO of WUC effective September 1, 2010.  According to the Proxy Statement, Ersek's Annual Incentive Plan award for 2009 was $699,321, and he earned 84,318 restricted stock unit "career shares" which, based on the value of Individual Defendant Gold's shares, are worth approximately $1 million.

64.    Individual Defendants Gold and Ersek are both officers and directors of the Company and derive substantial compensation from their respective positions.  As such, they are incapable of making an independent or disinterested decision as to whether to initiate suit on behalf of the Company.

B.    **The Audit Committee—Individual Defendants Devitre, Lacy, Levinson, and Mendoza**

65.    Individual Defendants Devitre (Chair), Lacy, Levinson, and Mendoza are currently and were members of the Audit Committee during the Relevant Period.  As such, they were responsible for "assist[ing] the Board of Directors in fulfilling its oversight responsibilities with respect to," among other things, "the Company's compliance with legal and regulatory requirements."

- 23 -

66.     As discussed above, the Audit Committee utterly and consciously failed to exercise its oversight responsibilities with respect to the Company's AML program.  Despite the known requirement to comply with the BSA and similar laws (*e.g.,* A.R.S. § 13-2317) and implement an AML program, the Board, including the Audit Committee, took no interest and had no involvement in the program, with the exception that the Board approved the Company's Global AML Policy Statement.  As such, the Audit Committee systemically failed to implement and oversee adequate internal controls sufficient to review, monitor, and prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable AML laws, rules, and regulations.

67.     The Audit Committee's lack of oversight is especially egregious in light of certain "red flags" that were known to it.  As stated in the 2010 10-K:

> Over the past several years, we have entered into consent agreements with federal and state authorities, including the [federal Financial Crimes Enforcement Network ("FinCEN")], the New York State Banking Department, the California Department of Financial Institutions and the Arizona Department of Financial Institutions, relating to the Bank Secrecy Act and anti-money laundering requirements and related consumer identification matters. These agreements required us to pay civil penalties and to take certain measures to enhance our compliance with recordkeeping, reporting, training and agent oversight requirements under applicable state and federal law. ***The consent agreements with the New York State Banking Department and the California Department of Financial Institutions were lifted during 2007. However, the financial services industry and businesses like ours continue to be under significant federal and state regulatory scrutiny with respect to the Bank Secrecy Act and anti-money laundering compliance matters.*** It is possible that as a result of periodic examinations or otherwise, we could be subject to deficiency findings, fines, criminal penalties, asset seizures or enforcement actions that could adversely affect our business, financial position and results of operations.
>
> The United States Department of Justice served one of our subsidiaries with a grand jury subpoena requesting documents in connection with an investigation into money transfers from the United States to the Dominican Republic during the last several years. The Company is cooperating fully with the DOJ investigation. Due to the stage of the DOJ investigation, the Company is unable to predict the outcome of the investigation or the possible loss or range of loss, if any,

associated with the resolution of any charges that may be brought against the Company.

(Emphasis added).

68.     For example, FinCEN determined in 2003 that the Company's "procedures and systems were inadequate to comply with the SAR requirements for reporting structuring because they did not identify all multiple transactions conducted by a customer across agents for a single day," and that the Company's failure to file SARs was willful. 2003 FinCEN Assessment of Civil Money Penalty with Undertakings, Exh. B, at 3-4. As a result, the Company consented to a civil monetary penalty of $3 million. *Id.,* at 5.

69.     In a related matter, the New York State Department of Banking found in 2002 that the Company failed to aggregate multiple currency transactions totaling more than $10,000 for the purpose of filing currency transaction reports, and the Company agreed to pay a fine of $8 million. *Id.,* at 1-2 & n.1

70.     The $94 million settlement with Arizona was thus one in a string of failures by the Company to comply with applicable AML requirements, which could have been avoided had Individual Defendants Devitre, Lacy, Levinson, and Mendoza not breached their fiduciary duties of good faith and loyalty.

71.     The intentional disregard of the aforementioned red flags by Individual Defendants Devitre, Lacy, Levinson, and Mendoza, as embodied by their utter conscious systemic failure to implement and oversee adequate internal controls sufficient to monitor and prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable AML laws, rules, and regulations, constitutes breaches of their duties of good faith and loyalty such that they face a substantial likelihood of personal liability for their actions/inaction.

72.     Because they face a substantial likelihood of personal liability on their part, Individual Defendants Devitre, Lacy, Levinson, and Mendoza cannot impartially consider a demand on the Board to commence litigation against them.

73.     Individual Defendants Devitre, Lacy, Levinson, and Mendoza, along with Individual Defendants Gold and Ersek, constitute six of the eleven members of WUC's Board, an absolute majority, and thus demand is futile.

C.     **The CG Committee—Individual Defendants Holden, Lacy, Miles, and Stevenson**

74.     In addition, as members of the CG Committee, Individual Defendants Holden, Lacy (Chair), Miles, and Stevenson, are currently and were members of the CG Committee during the Relevant Period.[6]  As such, they were responsible for "review[ing] and advis[ing] the Board regarding matters of public policy and social responsibility as they relate to the Company," including *"[r]eview[ing] the Company's compliance programs and policies relating to anti-money laundering laws."*  The Chairman of the Committee or his or her designee was required to "periodically, but not less frequently than annually . . . provide reports to the Audit Committee of the Board as to the status of and developments in this area."

75.     As discussed above, the CG Committee utterly and consciously failed to exercise its responsibilities to review and monitor the Company's compliance programs and policies relating to known AML requirements.  Despite the known requirement to comply with the BSA and similar laws and implement an AML program, the Board, including the CG Committee, took no interest and had no involvement in the program, with the exception that the Board approved

---

[6] Individual Defendant von Schimmelmann also is a member of the CG Committee.  Because he did not join the Board and the CG Committee until after the end of the Relevant Period, his actions or inaction *as a member of the CG Committee* need not be considered for the purpose of determining demand futility.

the Company's Global AML Policy Statement. As such, the CG Committee systemically failed to sufficient to review the Company's compliance programs and policies relating to known AML requirements and monitor their implementation to prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable AML laws, rules, and regulations.

76. This failure is especially egregious in light of the "red flags" discussed *supra* that were known to the members of the CG Committee.

77. The intentional disregard of the aforementioned red flags by Individual Defendants Holden, Lacy, Miles, and Stevenson, as embodied by their utter conscious systemic failure to review the Company's compliance programs and policies relating to known AML requirements and monitor their implementation to prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable AML laws, rules, and regulations, constitutes breaches of their duties of good faith and loyalty such that they face a substantial likelihood of personal liability for their actions/inaction.

78. Because they face a substantial likelihood of personal liability on their part, Individual Defendants Holden, Lacy, Miles, and Stevenson cannot impartially consider a demand on the Board to commence litigation against them.

79. Individual Defendants Holden, Lacy, Miles, and Stevenson, along with Individual Defendants Devitre, Levinson, Mendoza,Gold ,a nd Ersek, constitute nine of the eleven members of WUC's Board, an absolute majority, and thus demand is futile. Even if demand somehow is not futile with respect to the members of the Audit Committee, Individual Defendants Holden, Lacy, Miles, and Stevenson, along with Individual Defendants Gold and Ersek, comprise six of the eleven members of WUC's Board, an absolute majority.

## COUNT I

### Against The Individual Defendants
### for Breach of Fiduciary Duty

80.     Based upon the allegations set forth in the preceding paragraphs, the Individual
Defendants consciously and systemically failed to implement and oversee in good faith, and with
loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors,
employees, and agents of the Company from violating or acting in contravention to, applicable
AML and other legal requirements.

81.     Those Individual Defendants who participated in or had knowledge of the
Company's illegal activities and profited thereby acted intentionally, thereby breaching their
fiduciary duty of loyalty to the Company.

82.     The Individual Defendants who were directors and/or senior executive officers of
the Company abused the trust reposed in them by virtue of their positions and breached their
fiduciary duty of loyalty by utterly abdicating their duty of oversight.  As the result of their
sustained and systematic failure to exercise oversight, the Individual Defendants caused or
allowed the Company's business to be conducted in violation of the extensive legal requirements
and regulations that were known to them.

83.     By reason of the foregoing, the Individual Defendants have proximately caused
injury to the Company, which has been and will continue to be substantially damaged as the
foreseeable result of their wrongful acts and omissions.  As a result of the misconduct alleged
herein, the Individual Defendants are liable to the Company.

84.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT II

### Against The Individual Defendants
### For Waste Of Corporate Assets

85.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

86.    As a result of the Individual Defendants' and the Company's lack of internal controls, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused the Company to waste valuable corporate assets by, among other things, incurring millions of dollars of legal liability and/or expenses to investigate, defend, and resolve the proceedings in Arizona leading to the Settlement Agreement arising from the Individual Defendants' wrongful actions.

87.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

88.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that the directors and officers named as Individual Defendants herein have breached their fiduciary duties as alleged herein;

B.    Requiring the Individual Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

C.    Requiring the Individual Defendants to remit to the Company all of their salaries and other compensation received for the periods when they breached their duties;

D.    Ordering that the Individual Defendants and those under their supervision and control, refrain from the commission of such further unlawful activities as are alleged herein, and

implement comprehensive corrective measures including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of herein which will rectify all such wrongs as have been committed and prevent their recurrence;

     E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

     F.    Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 26, 2010

Respectfully submitted,

*s/ Kip B. Shuman*
Kip B. Shuman
Rusty E. Glenn
**THE SHUMAN LAW FIRM**
885 Arapahoe Avenue
Boulder, CO  80302
Telephone: 303/861-3003
303/484-4886 (fax)
Email: kip@shumanlawfirm.com
Email: rusty@shumanlawfirm.com

**EGAN YOUNG**
Eric L. Young
526 Township Line Road, Suite 100
Blue Bell, PA  19422
(215) 367-5151

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
919 North Market Street, Suite 980
Wilmington, DE  19801
(302) 295-5310

## VERIFICATION

I, Regina Reardon, as Fund Administrator of the U.F.C.W. Local 1776 &
Participating Employers Pension Fund ("UFCW Fund"), declare as follows:

1.      The U.F.C.W. Fund is a named Plaintiff in the accompanying Complaint.
We were and remain a shareholder of The Western Union Company ("WU"), from
January 13, 2004 to the present.

2.      As an authorized representative of the UFCW Fund, I have reviewed the
accompanying Complaint and state that it is true and correct to the best of my knowledge,
information and belief.

3.      This action is not a collusive one to confer jurisdiction on a court of the
United States that would not otherwise have jurisdiction.

4.      The UFCW Fund is committed to and hereby declares its intention to
fairly and adequately represent the interests of the shareholders of the WU in this action.

I declare under penalty of perjury that the foregoing is true and correct to the best
of my knowledge, information and belief.

Executed this 22nd day of July, 2010.

Regina Reardon
As Fund Administrator of the UFCW Local 1776 &
Participating Employers Pension Fund

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-1769-PAB-MEH

U.F.C.W. LOCAL 1776 & PARTICIPATING EMPLOYERS PENSION FUND, derivatively on behalf of The Western Union Company,

      Plaintiff,

v.

DINYAR S. DEVITRE,
HIKMET ERSEK,
CHRISTINA A. GOLD,
JACK M. GREENBERG,
BETSY D. HOLDEN,
ALAN J. LACY,
LINDA FAYNE LEVINSON,
ROBERTO G. MENDOZA,
MICHAEL A. MILES, JR.,
LORD DENNIS STEVENSON, and
WULF VON SCHIMMELMANN,

      Defendants,

- and -

THE WESTERN UNION COMPANY, and
WESTERN UNION FINANCIAL SERVICES, INC.,

      Nominal Defendants.

---

## PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE

---

Plaintiff, U.F.C.W. Local 1776 & Participating Employers Pension Fund ("Local 1776 Fund") by its attorneys, offers the following response to the Court's Order to Show Cause, dated August 3, 2010 ("Show Cause Order") (Doc. #6), as to why the above-captioned shareholder derivative action should not be dismissed for lack of subject matter jurisdiction as follows:

A.      **Procedural Background**

1.      Plaintiff filed its Verified Shareholder Derivative Complaint (the "Complaint" cited as "Compl. ¶ _") with the Court on July 27, 2010.  (Doc. #1).  The Complaint seeks injunctive and other relief on behalf of Nominal Defendants The Western Union Company ("WUC") and its wholly owned subsidiary Western Union Financial Services, Inc. ("WUFSI") (collectively, the "Company") arising from violations of fiduciary duty owed to the Company by its directors and/or officers in connection with their alleged conscious and systematic failure to implement and oversee the Company's compliance with applicable anti-money laundering ("AML") laws, regulations, and rules known to them, including but not limited to the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 *et seq.*, and A.R.S. § 13-2317.

2.      The Complaint alleges that the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 based upon the complete diversity of the parties and because the amount in controversy exceeds $75,000 exclusive of interests and costs.  Compl. ¶ 4.

3.      The Complaint states that Local 1776 Fund is, and was at all times relevant to the action, a shareholder of the Company.  Compl. ¶ 6.  The Complaint alleges that Local 1776 Fund is a citizen of New Jersey and Pennsylvania.  The Complaint also alleges that the defendants are citizens of other states.  Compl. ¶¶ 7-19.

4.      In the Show Cause Order, the Court noted that Local 1176 Fund had pled that it was a citizen of New Jersey and Pennsylvania without explaining the basis for its conclusion. Order to Show Cause at 2.  The Court noted that "it appears that the plaintiff is a labor union, but it is not clear how the plaintiff is organized, i.e., whether it is incorporated.  This fact may have a significant bearing on plaintiff's citizenship." *Id*. Citing *United Steelworkers of America, AFL-*

*CIO v. R.H. Bouligny*, 382 U.S. 145, 150-51 (1965), the Court suggested that Local 1776 Fund plaintiff might be considered a citizen every state in which its union members are citizens.

### B.   Local 1776 Fund Is An ERISA Pension Plan

5.     The plaintiff in this action is not the union itself but a pension plan governed, among other statutes, under the provisions of the Employee Retirement Investment Security Act ("ERISA"). *See* Affidavit of Eric L. Young, Exhibit A attached hereto, at ¶ 3.  Local 1776 Fund is a defined benefit plan providing retirees with a predetermined monthly retirement benefit upon reaching a specific age. *Id.*  The retirement benefit paid to a retiree is typically calculated using a formula which often employs years of credited service under the plan and salary information. *Id.* The retirement benefit is typically payable to the employee upon attainment of their normal retirement age for the remainder of his/her lifetime.  *Id.*

6.     Local 1776 Fund uses investments to generate income to provide benefits for participants and their beneficiaries, and to pay the costs of maintaining the plan. *Id.*, at ¶ 4. However, no members or participants in the Local 1776 Fund has any right, title or interest in or to the fund itself other than to receive the monetary benefits they are entitled to receive. *Id.*  In other words, the Local 1776 Fund owns its investments.  These investments include ownership of the Company's shares during the time relevant to this action as alleged in the Complaint.  Compl. ¶ 6.

7.     The Local 1776 Fund is sponsored and administered by a board of trustees consisting of representatives of both labor and management (the "Board of Trustees").  Exhibit A at ¶ 5. Members of the Board of Trustees are considered "Plan Fiduciaries" under the applicable provisions of ERISA. *Id.*  The current Board of Trustees currently consists of citizens of either Pennsylvania or New Jersey.  *Id.*  The Local 1776 Fund itself is a citizen of Pennsylvania.  *Id.*

8.     The Trustees, advised by counsel and investment professionals, have wide and exclusive administrative powers over the Local 1776 Fund.  The Board of Trustees and/or its duly authorized designee(s) has the exclusive right, power, and authority, in its sole and absolute discretion, to administer, apply and interpret the Local 1776 Fund and to decide all matters arising in connection with its operation or administration.  *Id*.  These powers include the sole and absolute discretionary authority to: (a)   take all actions and make all decisions (including factual decisions) with respect to the eligibility for, and the amount of, benefits payable; (b) formulate, interpret and apply rules, regulations and policies necessary to administer the Local 1776 Fund; (c) decide questions (including legal or factual questions) relating to the calculation and payment of benefits; (d) make investment decisions; and (e) authorize litigation on the 1776 Local Fund's behalf.  *Id*., at ¶ 6.  The Board of Trustees authorized the filing of this lawsuit through its designated Administrator, Regina C. Reardon, who executed the requisite form of verification attached to the Complaint on behalf of the 1776 Local Fund.  *See* Verification, Compl. at p. 31,.

**C.     <u>Legal Analysis</u>**

9.     Plaintiff agrees with the Court's citation to the Supreme Court's decision in *United Steelworkers of America, AFL-CIO v. R.H. Bouligny*, 382 U.S. 145, 150-51 (1965), that in circumstances where the union itself is a party to an action against it for defamation, the union is properly considered an unincorporated entity and the citizenship of all its members determines citizenship for purposes of 28 U.S.C. §1332.  (Doc. # 6).  Here, unlike the situation in *United Steel Workers*, the union is not the real party in interest.  382 U.S. at 146.  Plaintiff is actually the Local 1776 Fund.  A union employee benefit plan like the Local 1776 Fund is considered a trust and not a mere unincorporated organization.  *See Lennon v. St. Paul Mercury Ins. Co.*, 136 F.3d 1365, 1370 (10th Cir. 1998) (per curiam) ("regardless of what law applies, we cannot see how it

can be seriously argued that an employee benefit plan under ERISA is not an express trust").[1] As such, the citizenship of the Local 1776 Fund's Board of Trustees is determinative of its citizenship. *See NYSA-ILA GAI Vacation & Holiday Fund v. Poggi*, 617 F. Supp. 847, 849-50 (S.D.N.Y. 1985), *amended on recons.*, 624 F. Supp. 443 (citing *Navarro Savings Ass'n v. Lee*, 446 U.S. 458 (1980)).[2]

10.     The Tenth Circuit's holding in *Lennon* applies with equal force here.  In *Lennon*, the Circuit Court rejected an argument that the ERISA plan was an unincorporated association in connection with a suit brought by the certain union funds and their trustees against an insurer in connection with its refusal to pay on surety bond the insurer had issued to a corporation sued in another action for "fringe benefit contributions and other damages under collective bargaining agreements applicable" to construction at the Denver airport.  *Id*. at 1367.  Citing *Navarro*, the Tenth Circuit held that since the trustees had the authority to sue on behalf of the trusts to recover benefits owed to their participants, the citizenship of the trustees and not the members of the union itself determined citizenship.  *Id*. at 1370.  Here, unlike the situation in *Lennon*, neither the union member beneficiaries of the Local 1776 Fund nor its Board of Trustees could have been proper party plaintiffs because under Federal Rule of Civil Procedure 23.1, *only a shareholder of the corporation* has standing to pursue a derivative claim. *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1443 n.1 (10th Cir. 1995) (quoting *Schilling v. Belcher*, 582 F.2d 995,

---

[1] The Circuit Court ruled in *Lennon* that is decision was based upon the fact that the trustees has brought suit in their capacity as such and therefore it "expressed no opinion" if it would have reached a different conclusion had the plan itself been the sole plaintiff.  *Id*. at 1372 n.6.  The Circuit Court, however, cited several decisions to support such a finding including *Poggi*.  *Id*. n.3.

[2] As the Tenth Circuit noted in *Lennon*, some courts outside of this Circuit have determined ERISA plans to be unincorporated associations but did so without legal analysis. 136 F.3d at 1370.  Further none of the cases the Tenth Circuit cited involved a shareholder derivative case like this one.

999 (5th Cir. 1978)) ("[t]o have standing to sue as a representative plaintiff in a shareholder derivative action, a person must have owned stock at the time of the complained of acts (the 'contemporaneous ownership rule'), and 'must be a shareholder of the defendant corporation at the time suit is brought.'")  As set above, the actual shareholder with standing to sue in this action is the Local 1776 Fund itself, not any of its individual participants, because they only have a right to receive retirement benefits and have no ownership rights to the underlying securities that generate that income.  Exhibit A at ¶ 4.

11.    Under these circumstances, reference to citizenship of the union beneficiaries makes absolutely no sense when they lack even standing to sue.  The real party in interest in this case is the Local 1776 Fund itself, which is a citizen of Pennsylvania. *Id*., at ¶ 5.  Since the Board of Trustees has the authority to hire counsel to initiate litigation on behalf of Local 1776 Fund, counsel for plaintiff believed that, in an abundance of caution, they should assert in the Complaint that Local 1776 Fund was also a citizen of New Jersey because some of the members of the current Board of Trustees reside there.

**D.    Conclusion**

12.    For all of the foregoing reasons, Local 1776 Fund respectfully requests that the Court find that plaintiff has established sufficient cause to show that it has properly pled diversity jurisdiction pursuant to 28 U.S.C. §1332 and, in the alternative, should the Court rule otherwise, it dismiss this action without prejudice with leave to replead.

Dated: August 13, 2010                    Respectfully submitted,

                                           **THE SHUMAN LAW FIRM**

                                           s/ Kip B. Shuman
                                           Kip B. Shuman
                                           Rusty E. Glenn
                                           885 Arapahoe Avenue

Boulder, CO  80302
Telephone:   303/ 861-3003
Facsimile:   303/484-4886
Email:   kip@shumanlawfirm.com
Email:   rusty@shumanlawfirm.com

*Local counsel for Plaintiff*

**EGAN YOUNG**
Eric L. Young
526 Township Line Road, Suite 100
Blue Bell, PA  19422
(215) 367-5151

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
919 North Market Street, Suite 980
Wilmington, DE  19801
(302) 295-5310

*Counsel for Plaintiff*

### Certificate of Service

I hereby certify that the foregoing was filed with this Court on August 13, 2010 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.

s/ Rusty E. Glenn

Rusty E. Glenn

# Exhibit C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-01769-PAB

U.F.C.W. LOCAL 1776 & PARTICIPATING
EMPLOYERS PENSION FUND, derivatively on
behalf of The Western Union Company,

                Plaintiff,

    vs.

DINYAR S. DEVITRE, HIKMET ERSEK,
CHRISTINA A. GOLD, JACK M. GREENBERG,
BETSY D. HOLDEN, ALAN J. LACY, LINDA
FAYNE LEVINSON, ROBERTO G. MENDOZA,
MICHAEL A. MILES, JR., LORD DENNIS
STEVENSON, WULF VON SCHIMMELMANN,

                Defendants,

      - and -

THE WESTERN UNION COMPANY, and
WESTERN UNION FINANCIAL SERVICES,
INC.,

                Nominal Defendants.

**AFFIDAVIT OF ERIC L.
YOUNG IN SUPPORT OF
PLAINTIFF'S RESPONSE
TO ORDER TO SHOW
CAUSE**

COMMONWEALTH OF PENNSYLVANTIA    )
                                 ) ss.
COUNTY OF MONTGOMERY                )

    Eric L. Young, being duly sworn, deposes and says:

    1.    I am a partner in the law firm of Egan Young.  Egan Young is co-counsel

for plaintiff U.F.C.W. Local 1776 & Participating Employers Pension Fund ("Local 1776

Fund") in the above captioned action.

2.      I respectfully submit this Affidavit in support of plaintiff's response to the Court's Order to Show Cause, dated August 3, 2010, as to why this action should not be dismissed for lack of subject matter jurisdiction.

3.      The plaintiff in this action is not the union itself but a pension plan governed, among other statutes, under the provisions of the Employee Retirement Investment Security Act ("ERISA"). Local 1776 Fund is a defined benefit plan providing retirees with a predetermined monthly retirement benefit upon reaching a specific age. The retirement benefit paid to a retiree is typically calculated using a formula which often employs years of credited service under the plan and salary information.  The retirement benefit is typically payable to the employee upon attainment of their normal retirement age for the remainder of his/her lifetime.

4.      The Local 1776 Fund uses investments to generate income to provide benefits for participants and their beneficiaries, and to pay the costs of maintaining the plan. However, no members or participants in the Local 1776 Fund has any right, title or interest in or to the fund itself other than to receive the monetary benefits they are entitled to receive.

5.      The Local 1776 Fund is sponsored and administered by a board of trustees consisting of representatives of both labor and management (the "Board of Trustees"). Members of the Board of Trustees are considered "Plan Fiduciaries" under the applicable provisions of ERISA.  The current Board of Trustees currently consists of citizens of either Pennsylvania or New Jersey.   The Local 1776 Fund itself is a citizen of Pennsylvania.

6.     The Board of Trustees and/or its duly authorized designee(s) has the exclusive right, power, and authority, in its sole and absolute discretion, to administer, apply and interpret the Local 1776 Fund and to decide all matters arising in connection with its operation or administration.   These powers include the sole and absolute discretionary authority to: (a)   take all actions and make all decisions (including factual decisions) with respect to the eligibility for, and the amount of, benefits payable; (b) formulate, interpret and apply rules, regulations and policies necessary to administer the Local 1776 Fund; (c) decide questions (including legal or factual questions) relating to the calculation and payment of benefits; (d) make investment decisions; and (e) authorize litigation on the 1776 Local Fund's behalf.

Executed this 13[h] day of August, 2010 in Blue Bell, Pennsylvania.

_____
Eric L. Young

SWORN TO AND SUBSCRIBED
before me this 13th day of August, 2010

_____
Notary Public

My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Frances M. Subbio, Notary Public
Plymouth Township, Montgomery County
My commission expires August 24, 2013

# Exhibit D

1   **WARD, KEENAN & BARRETT, P.C.**
    Gerald Barrett, State Bar No. 5855
2   3838 North Central Ave., Suite 1720
    Phoenix, Arizona  85012
3   Tel: (602) 279-1717
    Fax: (602) 279-8908
4   gbarrett@wardkeenenbarrett.com

5   **RIGRODSKY & LONG, P.A.**
    Seth D. Rigrodsky *Pro Hac Vice application pending*
6   Brian D. Long *Pro Hac Vice application pending*
7   919 N. Market Street, Suite 980
    Wilmington, Delaware  19801
8   Tel.: (302) 295-5310
    Fax: (302) 654-7530
9

    **EGAN YOUNG**
10   Eric L. Young *Pro Hac Vice application pending*
    562 Township Line Road, Suite 100
11   Blue Bell, Pennsylvania  19422
    Tel.: (215) 367-5151
12   Fax: (215) 367-5143
13   Attorneys for Plaintiff

14              **SUPERIOR COURT OF ARIZONA**
                **COUNTY OF MARICOPA**
15

16   U.F.C.W. LOCAL 1776 & PARTICIPATING   )
    EMPLOYERS PENSION FUND, derivatively on  )
17   behalf of The Western Union Company,      )

18                 Plaintiff,        )
19           vs.             )

20   DINYAR S. DEVITRE, HIKMET ERSEK,    )
    CHRISTINA A. GOLD, JACK M. GREENBERG,  )
21   BETSY D. HOLDEN, ALAN J. LACY, LINDA   )
    FAYNE LEVINSON, ROBERTO G. MENDOZA,  )
22   MICHAEL A. MILES, JR., LORD DENNIS    )
    STEVENSON, WULF VON SCHIMMELMANN,   )
23

24               Defendants,      )

25            and           )

26   THE WESTERN UNION COMPANY, and    )
    WESTERN UNION FINANCIAL SERVICES, INC., )
27

28           Nominal Defendants.   )

COPY

SEP 23 2010

MICHAEL K. JEANES, CLERK
D. STEPHENS
DEPUTY CLERK

CV2010-027712

No. _____

## VERIFIED SHAREHOLDER DOUBLE DERIVATIVE COMPLAINT

Plaintiff, by its attorneys, alleges for its Verified Shareholder Double Derivative Complaint, upon personal knowledge as to itself and its own actions, and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through its attorneys, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder double derivative action seeking injunctive and other relief on behalf of Nominal Defendants The Western Union Company ("WUC") and its wholly owned subsidiary Western Union Financial Services, Inc. ("WUFSI") (collectively, the "Company"). The action arises from violations of fiduciary duty owed to the Company by its directors and/or officers. These violations, in turn, have substantially injured the Company.

2.      As detailed herein, the Individual Defendants (as defined herein) consciously and systemically failed to implement and oversee the Company's compliance with applicable anti-money laundering ("AML") laws, regulations, and rules known to them, including but not limited to the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 *et seq.*, and A.R.S. § 13-2317, that caused substantial losses to the Company beginning on September 29, 2006 through December 31, 2007 (the "Relevant Period"). The Company and the Individual Defendants knew about these requirements but ignored them with catastrophic financial results to the Company.

3.      The unlawful and systemic course of misconduct by the Company and the Individual Defendants spawned a Settlement Agreement dated February 11, 2010, with the Arizona Attorney General (in cooperation with the Attorneys General for the States of California, New Mexico, and Texas) (the "Settlement Agreement") in which the Company agreed to pay $94 million to resolve all potential regulatory, civil, and criminal claims arising from certain conduct specified in the Settlement Agreement involving payments tied to money

2

1    laundering violations that facilitated human smuggling from Mexico into the United States

2    through Arizona, all of which could, and should, have been prevented had the Individual

3    Defendants complied with their fiduciary duties.   Among other things, human smuggling of

4    illegal immigrants from Mexican and Central American locations has substantial negative effects

5    on efforts to improve working conditions for all members of the United States workforce.  The

6    

7    Settlement Agreement and its exhibits are fully incorporated herein by this reference.

8                                **JURISDICTION AND VENUE**

9         4.      This Court has jurisdiction over defendants because they conduct business in

10   Arizona and/or are citizens of Arizona.

11        5.      The Court has jurisdiction over this action because the amount in controversy

12   exceeds the Court's minimum jurisdictional requirements.

13        6.      Venue is proper in this Court because the conduct at issue took place and had an

14   

15   effect in this County.  Additionally, the Individual Defendants reside in Arizona and/or have

16   sufficient minimum contacts with Arizona to render the exercise of jurisdiction by the Arizona

17   courts permissible under traditional notions of fair play and substantial justice.

18        7.      Venue is also proper in this Court because a related proceeding brought by the

19   Attorney General of the State of Arizona was settled in this jurisdiction in *In the Matter of:*

20   *Western Union Financial Services, Inc.*, Case No. SW 2006-002213 (Ariz. Super. Ct., Maricopa

21   

22   Cty.).

23                                      **PARTIES**

24   **Plaintiff**

25        8.      Plaintiff U.F.C.W. Local 1776 & Participating Employers Pension Fund

26   ("Plaintiff") is, and was at all times during the Relevant Period, a shareholder of the Company.

27   Plaintiff brings this action derivatively in the right of and for the benefit of the Company.

28

                                            3

1  Plaintiff will fairly and adequately represent the interests of the Company and the shareholders of

2  the Company in enforcing the rights of the Company.  Plaintiff has verified this complaint,

3  including that it was a shareholder at the time of the conduct at issue.  A copy of the verification

4  is attached hereto as Exhibit 1.  Plaintiff is a citizen of New Jersey and Pennsylvania.

**Nominal Defendants**

9.       Nominal defendant WUC is incorporated in the state of Delaware and has its

principal executive offices located at 12500 East Belford Avenue, Englewood, Colorado 80112.

WUC and its subsidiaries provide global money transfer and payment services to individuals and

businesses.  WUC shares are traded on the New York Stock Exchange under the symbol "WU."

10.      Nominal Defendant WUFSI is a Colorado corporation with its principal executive

offices located at 6200 South Quebec Street, Greenwood Village, CO 80112.  WUFSI is a

financial services company whose primary business involves transmitting money sent by one

person to another person through interstate and/or foreign commerce via interstate or

international wire.  WUFSI is a wholly owned subsidiary of WUC.

**Current Director Defendants**

11.      Defendant Dinyar S. Devitre ("Devitre") is and has been a WUC director since

2006.  According to the Company's website, Devitre currently serves as Chairperson for the

Company's Audit Committee.  Devitre is a citizen of New York.

12.      Defendant Hikmet Ersek ("Ersek") has been a WUC director since April 26,

2010, according to a Company press release attached to a Form 8-K filed with the United States

Securities and Exchange Commission ("SEC") on April 27, 2010.  Ersek has been WUC's Chief

Operating Officer ("COO") since January 2010, after serving as Executive Vice President and

Managing Director for Europe, the Middle East, Africa, and the Asia Pacific region.  WUC

announced its intention for Ersek to replace Individual Defendant Gold as President and Chief

4

1   Executive Officer ("CEO") effective September 1, 2010.  Ersek is a citizen of Austria.

2         13.    Defendant Christina A. Gold ("Gold") has served as a director, President, and

3   CEO of WUC since 2006.  According to the Company's website, prior to these positions, Gold

4   served as a Senior Executive Vice President of First Data Corp.[1] and President of WUC from

5   May 2002.  Gold has announced her intention to retire effective September 1, 2010.  Gold is a

6   citizen of Colorado.

7

8         14.    Defendant Jack M. Greenberg ("Greenberg") is and has been a director of WUC

9   since 2006 and is currently its Non-Executive Chairman of the Board.  According to the

10  Company's website, Greenberg served as a director of First Data from 2003 to 2006.  Greenberg

11  is a citizen of Illinois.

12        15.    Defendant Betsy D. Holden ("Holden") is and has been a director of WUC since

13  2006. According to the Company's website, Holden is a member of the Corporate Governance

14  ("CG") Committee and the Compensation and Benefits Committee.  Holden is a citizen of

15

16  Illinois.

17        16.    Defendant Alan J. Lacy ("Lacy") is and has been a director of WUC since 2006.

18  According to the Company's website, Lacy is currently Chair of the CG Committee and a

19  member of the Audit Committee.  Lacy is a citizen of Illinois.

20        17.    Defendant Linda Fayne Levinson ("Levinson") is and has been a director of WUC

21  since 2006.  According to the Company's website, Levinson is currently Chair of the

22  Compensation and Benefits Committee and a member of the Audit Committee.  Levinson is a

23  citizen of California.

24

25        18.    Defendant Roberto G. Mendoza ("Mendoza") is and has been a director of WUC

26  since 2006.  According to the Company's website, Mendoza is a member of both the Audit

27

28  ───────────────

[1] The Company was spun off from First Data as an independent entity on September 29, 2006, and is no longer affiliated with First Data.    5

Committee and the Compensation and Benefits Committee. Mendoza is a citizen of New York.

19.     Defendant Michael A. Miles, Jr. ("Miles") is and has been a director of WUC since 2006. According to the Company's website, Miles is a member of the CG Committee. Miles is a citizen of Massachusetts.

20.     Defendant Lord Dennis Stevenson ("Stevenson") is and has been a director of WUC since 2006. According to the Company's website, Stevenson is a member of both the CG Committee and the Compensation and Benefits Committee. Stevenson is a citizen of the United Kingdom.

21.     Defendant Wulf von Schimmelmann ("von Schimmelmann") is and has been a director of WUC since 2009. According to the Company's website, von Schimmelmann is a member of both the CG Committee and the Compensation and Benefits Committee. Upon information and belief, von Schimmelmann is also a member of the board of directors of WUFSI. von Schimmelmann is a citizen of Germany.

22.     The defendants listed in paragraphs 9 through 19 shall be referred to as the "Individual Defendants" and collectively, with the Nominal Defendants, shall be referred to as "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     The Individual Defendants, because of their positions of control and authority as directors or officers of the Company, were able to and did, directly and indirectly, control or fail to control the wrongful acts complained of herein. Because of their directorial and executive positions with the Company, each of the Individual Defendants had access to adverse non-public information about the financial condition and operations of the Company, including, without limitation, the misconduct of the other Individual Defendants.

24.     At all material times hereto, each of the Individual Defendants was the agent of

1   each of the other Individual Defendants and of the Company, and was at all times acting within

2   the course and scope of said agency.

3          25.    To discharge their duties, the officers and directors of the Company were required

4   to exercise reasonable and prudent supervision over the management, policies, practices, and

5   controls of the financial, business, and corporate affairs of the Company.  By virtue of such

6   duties, the officers and directors of the Company were required, among other things, to:

7

8          a.    Manage, conduct, supervise, and direct the business affairs of the

9   Company in accordance with the laws of the United States, the states in which it conducted

10   business, and the Company's charter and bylaws;

11          b.    Implement and oversee in good faith, and with loyalty, adequate internal

12   controls sufficient to monitor and prevent the officers, directors, employees, and agents of the

13   Company from violating or acting in contravention to applicable federal and state laws, rules,

14   and regulations; and

15

16          c.    Refrain from using their status as directors or officers to the detriment of

17   the Company and its shareholders.

18          26.    Certain Individual Defendants assumed additional fiduciary duties in connection

19   with their service on the WUC Board's Audit Committee, duties which they were required to

20   exercise with loyalty and in good faith.  According to its charter, the Audit Committee "assist[s]

21   the Board of Directors in fulfilling its oversight responsibilities with respect to," among other

22   things, "the Company's compliance with legal and regulatory requirements."  The Audit

23   Committee members are required to, among other things, "[a]s appropriate, review and direct the

24   investigation of possible violations of law and of the Company's Code of Conduct, retain outside

25   counsel and other experts to assist in such investigations and direct that appropriate remedial

26   steps are taken if such violations are detected," as well as "[r]eport the activities of the

27

28

1   Committee to the Board of Directors on a regular basis and review issues with the Board as the

2   Committee deems appropriate."

3       27.    As alleged herein, each of the members of the Audit Committee violated their

4   duties as members of the committee in that they consciously and systemically failed to

5   implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to

6   monitor and prevent the officers, directors, employees, and agents of the Company from

7   violating or acting in contravention to applicable laws, rules, and regulations, especially high

8

9   risk, high profile laws such as those pertaining to AML.

10      28.    Certain Individual Defendants assumed additional fiduciary duties in connection

11  with their service on the WUC Board's CG Committee.  According to its charter, the CG

12  Committee, among other things, "review[s] and advise[s] the Board regarding matters of public

13  policy and social responsibility as they relate to the Company."  Its members are required to,

14  among other things, "[r]eview the Company's compliance programs and policies relating to anti-

15  money laundering laws, including investigations or other matters that may arise in relation to

16

17  such laws."  In addition, "periodically, but not less frequently than annually, the Chairperson of

18  the Committee, or his or her designee, shall provide reports to the Audit Committee of the Board

19  as to the status of and developments in this area."

20      As alleged herein, each of the members of the CG Committee violated their duties as

21  members of the Committee in that they consciously and systemically failed to implement and

22  oversee in good faith, and with loyalty, adequate controls sufficient to monitor and prevent the

23  officers, directors, employees, and agents of the Company from violating or acting in

24  contravention to applicable AML laws, rules, and regulations.

25

26                          **SUBSTANTIVE ALLEGATIONS**

27  **Background**

28

8

29.    According to WUC's Form 10-K filed with the SEC on February 26, 2010 (the "2010 10-K"):

> Individual money transfers from one consumer to another are the core of our business, representing 85% of our total consolidated revenues for 2009. We offer consumers a variety of ways to send money. . . . [M]ost remittances are sent in cash at one of our more than 410,000 agent locations worldwide. . . . We also offer consumers several options to receive a money transfer. . . . [T]he vast majority of transfers are paid in cash at agent locations . . . .

> \*                            \*                            \*

> Our revenue is derived primarily from transaction fees charged to consumers to transfer money. In money transfers involving different send and receive currencies, we also generate revenue based on the difference between the exchange rate set by Western Union to the consumer and the rate at which we or our agents are able to acquire currency.

> In a typical money transfer transaction, a consumer goes to one of our agent locations, completes a form specifying, among other things, the name and address of the recipient, and delivers it, along with the principal amount of the money transfer and the fee, to the agent. This sending agent enters the transaction information into our money transfer system and the funds are made available for payment, usually within minutes. The recipient enters an agent location in the designated receiving area or country, presents identification and is paid the transferred amount. Recipients do not pay a fee. . . . We determine the fee paid by the sender, which generally is based on the principal amount of the transaction and the locations to and from which the funds are sent and are to be transferred.

> \*                            \*                            \*

> *Over 85% of our consumer-to-consumer transactions involve at least one non-United States location.*

> \*                            \*                            \*

> *We offer money transfer services worldwide. In 2009, over 95% of our consumer-to-consumer transactions were cash money transfers involving our walk-in agent locations around the world. . . .*

> \*                            \*                            \*

> <u>Walk-in money transfer service</u>. *The majority of our remittances constitute transactions in which cash is collected by the agent and payment (usually cash) is available for pick-up at another agent location in the designated receive location, usually within minutes. . . .*

(Emphasis added).

9

30.     The Company operates in a heavily regulated environment.   As the Company acknowledged in the 2010 10-K:

> Another significant trend impacting the money transfer industry is the increase in regulation in recent years. Regulation in the United States and elsewhere focuses, in part, on anti-money laundering and anti-terrorist activities. Regulations require money transfer providers, banks and other financial institutions to develop systems to detect, monitor and report certain transactions.

*                    *                    *

> Our money transfer and money order services are subject to anti-money laundering laws and regulations, including the Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001 (collectively, the "BSA") and similar state laws and regulations. The BSA, among other things, requires money transfer companies and the issuers and sellers of money orders, to develop and implement risk-based anti-money laundering programs, report large cash transactions and suspicious activity, and in some cases, to collect and maintain information about consumers who use their services and maintain other transaction records. Many states impose similar and, in some cases, more stringent requirements. These requirements also apply to our agents. In addition, the United States Department of the Treasury has interpreted the BSA to require money transfer companies to conduct due diligence into and risk-based monitoring of their agents inside and outside the United States.

31.     On February 11, 2010, the Attorney General of the State of Arizona announced the Settlement Agreement with WUFSI resulting from WUFSI's request for "a global resolution of all potential regulatory, civil, and criminal actions that could arise from conduct described in" a "Statement of Admitted Facts" attached as Exhibit A to the Settlement Agreement.   Settlement Agreement, ¶ 4.   The Settlement Agreement was prompted by, among other things, alleged violations of Arizona's AML statute, A.R.S. § 13-2317.

32.     The Settlement Agreement ended litigation between Arizona and WUFSI beginning in 2006, after the State directed WUFSI to produce data reflecting any wire transfers in an amount of $300 or more to any location in the State of Sonora, Mexico from any Company location worldwide for a three-year period and obtained warrants authorizing seizure for forfeiture of certain transfers sent to or from   Arizona, as well as transfers from twenty-eight

states other than Arizona to twenty-six locations in Sonora.

33.     The Settlement Agreement and the Statement of Admitted Facts acknowledged that WUFSI "has specific duties imposed by federal and state law to develop, implement, and maintain an effective [AML] program and to comply with various record keeping and reporting requirements that are designed to assist governmental agencies in detecting and preventing money laundering" and had "developed and implemented a risk-based . . . AML compliance program that is designed to prevent, detect, and report potential money laundering activities." Settlement Agreement, ¶ 3; *Id.*, Exh. A, ¶ 2. However, its AML compliance program clearly was deemed insufficient, because WUFSI agreed to pay $23 million to enhance its AML program *and* to be subject to an independent Monitor. *See infra.*

34.     In the "Statement of Admitted Facts," Exh. A to the Settlement Agreement, WUFSI admitted, among other things, that:

> a.     Between 2003 and 2007, *it had data and other information available to it,* which, when viewed as a whole, *gave it reason to know that one or more persons employed at the authorized delegate locations in Arizona* referred to in paragraph b. below, and at the locations referred to in paragraph d. below, *while acting within the scope of their employment and motivated at least in part to benefit WUFSI, were knowingly engaged in a pattern of money laundering violations that facilitated human smuggling from Mexico into the United States through Arizona.*

> b.     From 2003-2005 the WUFSI payouts at the eight Arizona locations listed below totaled $176,735,000 in wires of $500 or more sent to the location from one of the 29 States that were the most frequent destinations for *persons being smuggled from Mexico into the United States through Arizona.* These amounts include both legal and illegal transactions.

> Location A $34,825,000
> Location B $28,706,000
> Location C $28,428,000
> Location D $18,892,000
> Location E $18,702,000
> Location F $16,567,000
> Location G $15,507,000
> Location H $15,108,000

> c.     Beginning in 2006, WUFSI limited money transfer

11

transactions into Arizona to a maximum of $450. Because *smuggling into the United States through Arizona continued, smugglers had their payments wired to other places outside the United States*.

        d.     From 2005-2007, WUFSI payouts at the following eight locations outside the United States totaled $142,446,000 in wires of $500 or more sent to the location from one of the 29 States that were *the most frequent destinations for persons being smuggled into the United States through Arizona*. These amounts include both legal and illegal transactions.

> Location I $36,200,000
> Location J $20,666,000
> Location K $20,069,000
> Location L $19,872,000
> Location M $18,141,000
> Location N $14,654,000
> Location O $ 6,664,000
> Location P $ 6,180,000

*Id.*, Exh. A, ¶¶ 4-7 (emphasis added).

        35.     WUFSI "accepted and acknowledged its responsibility for its conduct as set forth in the Statement of Admitted Facts." Settlement Agreement, ¶ 6.

        36.     In order to settle any forfeiture claims the State of Arizona may have against WUFSI, as well as any other potential regulatory, civil and criminal claims or actions that could arise from the Statement of Admitted Facts, WUFSI agreed:

        a.     To pay the State of Arizona $21 million to reimburse the State for its costs and expenses of prosecution and investigation;

        b.     To pay $23 million for non-law enforcement expenses associated with enhancing its AML Program for the Southwest Border Area ("SBA")[2] and to implement the recommendations of a Monitor whom it was agreeing to fund from that amount;

        c.     To pay $50 million to the State Center, a 501(c)(3) entity, to establish an SBA Anti-Money Laundering Alliance Fund to make grants to law

---

[2] The SBA is defined as "all of Arizona and the area within 200 miles north and south of the United States/Mexico border." Settlement Agreement, ¶ 3.

12

enforcement organizations in Arizona, California, New Mexico, and Texas to combat money laundering and related criminal activity in the SBA;

d.     To full compliance with applicable state law and the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 through 5330, and all of its implementing regulations with respect to the SBA. Further, to comply with the BSA, A.R.S. §§ 6-1241 and 13-2317, and the Settlement Agreement, WUFSI agreed to continue to adhere to its BSA/AML program measures in existence or in the process of being implemented in the SBA, as described in the KPMG Report, consistent with the principles set forth in the Financial Action Task Force[3] Risk-Based Approach Guidance relating to money services businesses, and to implement additional program measures recommended by an independent Monitor in the SBA;

e.     With respect to transactions that are sent from or received in the SBA, to in all material respects completely, fully, and timely comply with all legal, record keeping, and reporting obligations imposed on it by applicable state law; by the BSA and the BSA's implementing regulations; and by the requirements of the Settlement Agreement, including, but not limited to, its obligation to maintain its AML Program for the SBA and implement additional Program measures recommended by the Monitor in the SBA;

f.     To be overseen by an independent Monitor for at least 29 months and no more than 41 months after the Settlement Agreement is executed.  The Monitor is required to evaluate WUFSI's compliance with its obligations under this Agreement and the Engagement Letter attached as an exhibit thereto, review and monitor the effectiveness of WUFSI's risk-based AML compliance Program for the SBA, and make such recommendations as the Monitor believes may improve the Program, as provided in the Engagement Letter.

*Id.,* ¶¶ 8-9, 16, 17.2, 19, 21-23.

37.     The Engagement Letter described in detail the Monitor's functions, which include:

a.     Conducting an Initial Review of WUFSI's AML program in the SBA;

b.     Reviewing WUFSI's risk assessment that it must prepare under the Engagement Letter;

c.     Evaluating WUFSI's SBA AML Program functions;

d.     Evaluating WUFSI's SBA AML Program integrity (including whether WUFSI "designates an individual or individuals at the executive level

---

[3] The Financial Action Task Force is an international intergovernmental body established in 1989 at the G-7 Summit. See www.fatf-gafi.org/dataoecd/43/46/38960576.pdf.

with responsibility for the Program, [and] provides such individual(s) with appropriate reporting lines within the corporate structure and sufficient access to [its] Board of Directors");

    e.    Issuing an Implementation Plan and making recommendations reasonably designed to implement or improve the SBA AML integrity program;

    f.    Investigating potential breaches of the Settlement Agreement and the AML laws in the SBA;

    g.    Preparing periodic reports monitoring and evaluating compliance with Engagement Letter; and

    h.    Preparing a final report.

*Id.,* Exh. B, ¶¶ 13, 15-20, 27-28, 30-31.

    38.    The Settlement Agreement recognized that WUFSI had an existing AML program that was "designed to prevent, detect, and report potential money laundering activities." Moreover, it had "dedicated substantial resources to, among other things: developing transaction monitoring systems to detect potentially suspicious activity; building a team of AML professionals; screening, training, and monitoring its Agents; producing AML policies and manuals; and implementing compliance measures" in the SBA. Settlement Agreement, ¶ 3.

    39.    The Engagement letter also acknowledged that WUFSI had a "large and complex" BSA AML compliance program that spans all of its locations, including the SBA. Settlement Agreement, Exh. B, ¶ 1.

    40.    The Statement of Admitted Facts even stated that "*any* reasonably applied controls, including controls implemented as a result of a reasonably implemented risk-based approach, will not identify and detect all instances of money laundering." Settlement Agreement, Exh. A, ¶ 3.

    41.    Nevertheless, the Company's AML program was insufficient to avoid nearly $100 million in sanctions per its agreement with the Arizona Attorney General because WUFSI had "*reason to know* that one or more persons  employed at the authorized delegate locations

14

1   in Arizona" specified in the Statement of Admitted Facts and "at the [other] locations referred

2   to" therein *while acting within the scope of their employment and motivated at least in part to*

3   *benefit [WUFSI], were knowingly engaged in a pattern of money laundering violations that*

4   *facilitated human smuggling from Mexico into the United States through Arizona,*" *id.,* exh.

5   A, ¶ 4, yet allowed such reprehensible, immoral, and illegal conduct to occur.

6

7       42.     On December 23, 2008, nearly a year after the Relevant Period ended, the

8   Company retained KPMG LLP to evaluate its BSA/AML compliance program.  "Report on

9   Assessment of BSA/AML Money Transfer Compliance Program" (the "KPMG Report"), May 8,

10  2009, at 3.  "KPMG was asked to focus on the BSA/AML compliance internal control structure

11  applicable to the Company's operations and Agent networks in North America and Mexico,

12  specifically." *Id.,* at 4.  "Moreover, and in part as a result of regulatory scrutiny and heightened

13  media attention to illegal activity associated with the [SBA], such as drug trafficking and human

14  smuggling, [the Company] asked KPMG to pay particular attention to AML program elements

15  that have been implemented to address the risks associated with these issues." *Id.*  KPMG was

16  also requested "to focus exclusively on [the Company's] money transfer services." *Id.*

17

18      43.     The KPMG Report confirmed that the Company only "[r]ecently" became

19  focused on the SBA in general, and human trafficking in particular, with especial emphasis

20  placed on Arizona.  It stated that:

21

22          Western Union has enacted more stringent controls on transactions going into or
            out of Arizona. Money transfer transactions into Arizona have been limited to a
23          maximum of $450[4] and all transactions of $1 or more that originate from or are
            paid in Arizona are reviewed by WireWatch+.[5]  Special business rules in

24

25  [4] According to the KPMG Report, "[t]he $450 limit was put in place to ensure that Western
    Union could meet the Arizona Department of Financial Institution's directive that Agents cease
26  violating the AZ Attorney General's Geographic Targeting Orders (GTOs). Since the GTOs had
    a threshold of $500, Western Union implemented a lower threshold of $450 so Agents would not
27  be paying out any transactions that could be subject to the GTO." KPMG Report, at 63 n.149.

28  [5] "WireWatch+ is Western Union's proprietary transaction monitoring application. WireWatch+
    is a rules-based application used to monitor all money transfer transactions. Among other things,

13

WireWatch+ with lower thresholds are also being used to monitor for potentially suspicious activity in Arizona.[] Additionally, manual transaction monitoring is also performed, with a regular examination of an Arizona Spike Report, designed to detect abnormal increases in activity.

*     *     *

[T]here are also plans to add a new front-end consumer matching program called Galactic ID[] to Arizona point-of-sale systems. This IBM E[ntity]A[nalytic] S[olutions] tool will create consumer matching, then RTRA, a Western Union proprietary system, will utilize Galactic ID to aggregate activity and apply tailored business rules thereto. Once implemented in conjunction with the Real Time Risk Assessment system Arizona will become the first U.S. state where Western Union will have the ability to freeze suspicious transactions before they are processed. It is anticipated that the program will launch in early 2009.

Western Union initiated a new program in *September of 2006,* applicable to all Southwest Border States, whereby consumers would be required to provide a valid U. S. Government issued identification document for all transactions that require a Social Security Number made within 200 miles of the Mexican border. This additional identification requirement is designed to mitigate additional risks identified, such as the risk that consumers are providing false identification information or that Western Union's services could be being used to conduct "coyote" transactions. Affected Agents were notified of this new requirement by Western Union in writing, via a letter that specified, among other things, that "effective immediately, consumers must present an acceptable form of U.S. government-issued ID when also presenting a U.S. Social Security Number (SSN) for Receive transactions of $500 or more, or Send transactions of $1,000 or more." Notification letters, which required immediate compliance from the Agents upon receipt, were first sent out in March of 2007 and included all new Arizona-based Agents, followed by all new Agents located within 200 miles of the Mexican border, including California, New Mexico, and Texas.

*Id.,* at 63-64 (footnotes omitted; emphasis added).

44.     The facts that the Company "recently" became interested in the SBA and Arizona, limited money transfer into Arizona *beginning in 2006* to a maximum of $450, Settlement Agreement Exh. A, ¶ 6, and initiated a new SBA identification program in September 2006 were all related to actions threatened by the Arizona Attorney General in 2006, including demands for information about send and receive transactions originating and terminating in Senora and seizure of all money transfers from twenty-eight U.S. states to Sonora (not including Arizona)

---

the application identifies potentially suspicious activity and generates alerts, which are forwarded to the Research and Reporting group for analysis." KPMG Report, Appendix A.

1   beginning the week of *September* 18, 2006, and all Mexico-bound transfers from targeted U.S.

2   jurisdictions if the sender requested any change, refund, or cancellation.

3       45.     As was the case in the Settlement Agreement, KPMG found that the Company

4   had "established a well-formed, well-documented risk-based AML Program." KPMG Report, at

5   6. It had even "implemented enhanced compliance measures to address its higher risk areas"

6

7   such as the SBA. *Id.*, at 7.

8       46.     Nevertheless, KPMG identified *twenty-six* separate recommendations for

9   enhancements to the Company's AML program. *Id.*, at 9. It summarized them as follows:

10      Specifically, we have identified a few recommendations which may enhance the
        current program's more reactive approach (i.e., with more emphasis on addressing
11      audit and/or regulatory findings) with a more proactive approach (i.e., attempts to
        identify and address industry trends, regulatory expectations, and audit issues in
12      advance) regarding certain aspects of the program. This may result in a more
        holistic and strategic effort and allow the Program to continue to meet industry
13      standards for the foreseeable future. For example, KPMG recommends analyzing
        individual AML risk assessment components in the aggregate to determine how
14      their correlation with one another may further raise or lower overall risk levels
        and how this information can be leveraged for other program elements (e.g.,
15      transaction and/or Agent monitoring). Other recommendations include, but are
        not limited to, ensuring certain processes and additional compliance measures that
16      have already been implemented in practice are properly documented (such as
        ongoing reporting to senior management); considering the creation of a formal
17      oversight committee, which includes management across all relevant functions to
        avoid the potential for communication gaps, duplication of efforts, and to allow
18      for streamlining across projects and resources; the development of detailed action
        plans to describe ongoing initiatives and track progress relating thereto; and
19      implementing a more formal schedule for ongoing tuning and testing of
20      transaction monitoring application rules and parameters.

21

22  *Id.*, at 7-8 (footnote omitted).

23      47.     The KPMG Report stated that WUC's Board *"must invariably . . . be familiar*

24  *with the BSA/AML internal control structure that has been implemented to ensure compliance."*

25  *Id.*, at 12 (emphasis added).  Having said this, it found that the Board was barely, rather than

26  invariably, familiar with the Company's BSA/AML structure.  The Report determined that the

27

28  Board only approves the Company's "Global   AML Policy Statement" and revisions thereto;

                                        17

it *does not* approve the Company's "U.S. BSA/AML Manual." *Id.*, at 14. Thus, to paraphrase the words of the Company's consultant, the Board is not "invariably familiar" with the Company's "BSA/AML internal control structure that has been implemented" and is in no position to ensure that the Company is in compliance with applicable requirements.

48.    The KPMG Report also determined that neither the Board nor the Company's Chief Compliance Officer are required to review the "standards, guidelines and procedures [developed to] provide further clarification, application and interpretation of the AML policies." *Id.* (brackets in original).

49.    The Board has thus utterly and systemically abdicated its responsibilities for implementing and overseeing the Company's AML compliance program and procedures.

50.    The KPMG Report noted that "the success of [the Company's] AML Program, as with any AML Program, depends to a large extent on the effectiveness of ongoing communication between and among *the Board*, senior management, Company employees at all levels (particularly those with compliance responsibilities), Agents, regulators, and law enforcement." *Id.*, at 17 (emphasis added; footnote omitted). It added that "organizations with AML Programs that exceed industry standards have generally implemented a formal process for reporting information related to regulatory examination findings, AML Program developments, changes in the Company's risk profile, or the like, *to members of the Board* and senior management on an ongoing basis." *Id.* (emphasis added). It then discussed employees' understanding of their roles and responsibilities, and the Company's compliance culture and dedication to improving its AML program, but made no mention of the Board's understanding thereof or involvement therein. *Id.*, at 17-18.

51.    The KPMG Report posited that the Company has "appropriately developed a variety of templates/tools specifically designed to keep senior management and/or the Board

abreast of changing program risks and mitigating controls" in that "both the Chief Compliance Officer and Senior Vice President (SVP) of Global Service Support (GSS) receive reports from their subordinates that are relevant to the specific functions they oversee." *Id.*, at 19. It summarized that "[w]hile it is clear that in practice updates on compliance issues are provided to senior management and/or the Board on a periodic basis, **these efforts are not reflected in either the _Global AML Policy Statement_ or _U.S. BSA/AML Manual_ and should be documented** to foster greater sustainability and accountability." *Id.* (emphasis added). Moreover, it gave no specific indication that such information is ever provided to the Board.

52.   The KPMG Report found that while the "Board is responsible for designating a qualified individual responsible for coordinating and monitoring day-to-day BSA/AML compliance," it "remains ultimately responsible for BSA/AML compliance and, thus, must play an integral role in the oversight of the AML Program through active monitoring of its effectiveness." *Id.*, at 20. As evidence of the Board's compliance, it said:

> the *Global AML Policy Statement* specifies that the "Western Union Global AML Policy is to receive annual Board approval;" and the *U.S. BSA/AML Manual* further states that Western Union's AML Program includes "an ongoing review of existing policies, procedures and internal controls, and Sr. AML Compliance Management and/or Western Union Board approval of the policies and procedures when changes of a significant nature have occurred."

*Id.* Nevertheless, as noted above, the Board does not review or approve changes to AML policies and procedures, leaving them to lower level employees.

53.   The Report stated that the Company "is required by regulation to independently test its AML Program to ensure that it has been implemented and is operating effectively." *Id.*, at 24. Such testing is done annually by the Company's Internal Audit department. "The results of these reviews are communicated to the Chief Compliance Officer and to other members of senior management as applicable," but there is no indication they are reported to the Board. *Id.*

54.   As such, the KPMG Report  made an affirmative recommendation that:

To promote continued and sustainable accountability, [the Company] should consider updating the *Global AML Policy Statement* and *U.S. BSA/AML Manual* to reflect (at a minimum via an overview) the reporting measures which are already occurring in practice to ensure that senior management *and/or the Board stay apprised of significant changes to Western Union's BSA/AML Program, relevant regulatory developments, examination and/or internal audit findings (if any), and/or changes in the Company's BSA/AML risk profile (among other things)*. Moreover, it is the Chief Compliance Officer's responsibility to ensure that such reporting is timely and ongoing and, as such, should also be included in the roles and responsibilities section of both documents.

*Id.,* at 25 (emphasis added).

55.     The KPMG Report made twenty-five other specific recommendations to improve the Company's BSA/AML money transfer compliance program.   A number were of such consequence that they cast doubt on the Report's ultimate conclusion that the Company "has established a well-formed, well-documented risk-based AML Program." *Id.,* at 6.

56.     Among the more significant recommendations made by KPMG:

- It appears that transaction monitoring is tested and/or tuned in reaction to regulatory or Internal Audit findings. . . . *[T]hresholds should be tested and tuned on a regular and more proactive basis.* The results of these tuning exercises should be documented. *It appears this is more often performed in reaction to regulatory or Internal Audit pressure instead.*

*            *            *

- Western Union should determine whether more periodic analysis and tuning of the decision matrices used by Analysts to conduct investigations of potentially suspicious activity could identify new efficiencies in the process and avoid unnecessary SAR [Suspicious Activity Report] filings (i.e., by more effectively determining whether unusual activity is in fact suspicious).

*            *            *

- In line with its commitment to implementing an AML Program that exceeds industry standards, *Western Union should enhance existing SAR policies and procedures to describe the possible repercussions against Agents and/or types of measures taken in response to repeated SAR filings. At a minimum, existing policies and procedures should specify whether an Agent relationship can be terminated as a result of SAR filings, and whether controls can be put in place to limit the extent to which an Agent is authorized to sell Western Union services and products when a related issue has been identified and   not yet resolved.*

20

KPMG Report, at 66, 71-72 (emphasis added).

57.     These findings demonstrated that, among other things, the Company's AML program was reactive, not proactive, in the critical area of transaction monitoring; it lacked critical quality controls with regard to SAR filing; and that its policies and procedures were deficient concerning consequences to Agents as a result of repeated SAR filings. None of this would have been known by the Board because it had disengaged itself from the creation and implementation of the Company's AML program, save for its desultory approval of its Policy Statement.

58.     The complete lack of attention to the Company's AML Program by the Board described above is particularly egregious in light of the duties of the Audit Committee to "assist the Board of Directors in fulfilling its oversight responsibilities with respect to . . . the Company's compliance with legal and regulatory requirements," and the duties of the CG Committee to "[r]eview the Company's compliance programs and policies relating to anti-money laundering laws . . . and periodically, but not less frequently than annually, [to require] the Chairperson of the Committee, or his or her designee, [to] provide reports to the Audit Committee of the Board as to the status of and developments in this area."

## DEMAND IS FUTILE

59.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company because of breaches of fiduciary duty by the Individual Defendants.

60.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights. This action is not a collusive one designed to confer jurisdiction on this Court that it would otherwise not have.

61.     Plaintiff is the owner of WUC  common stock and was the owner of such

21

1    shares at all times relevant to the Individual Defendants' wrongful course of conduct alleged

2    herein.

3        62.    Plaintiff has not made a demand on the Board of Directors to bring this cause of

4    action because such a demand would be futile.  Currently, the Company's Board consists of

5    eleven members:  Individual Defendants Devitre, Ersek, Gold, Greenberg, Holden, Lacy,

6
     Levinson, Mendoza, Miles, Stevenson, and von Schimmelmann.  As discussed in detail below, a
7
     majority of the current directors, *i.e.*, at least six of the eleven Board members at the time this
8
9    complaint was filed, have specific personal conflicts of interest or have demonstrated their

10   individual inability to act independently and impartially.

11   A.    **Company Officers—Individual Defendants Gold and Ersek**

12       63.    Individual Defendant Gold has been the President and CEO of WUC since 2006,

13
     and was a Senior Executive Vice President of First Data, and President of WUC, beginning in
14
15   May 2002.  According the Company's DEF 14A filed with the SEC on March 30, 2010 (the

16   "Proxy Statement"), Individual Defendant Gold earned $2,349,750 (base salary and Annual

17   Incentive Plan award) in 2009, plus 168,635 restricted stock unit "career shares" with a grant

18   date value of $2 million.

19       64.    Individual Defendant Ersek has been COO of WUC since January 2010, after

20   serving as Executive Vice President and Managing Director for Europe, the Middle East, Africa,

21
     and the Asia Pacific region, and he will become President and CEO of WUC effective September
22
23   1, 2010.  According to the Proxy Statement, Ersek's Annual Incentive Plan award for 2009 was

24   $699,321, and he earned 84,318 restricted stock unit "career shares" which, based on the value of

25   Individual Defendant Gold's shares, are worth approximately $1 million.

26       65.    Individual Defendants Gold and Ersek are both officers and directors of the

27   Company and derive substantial compensation from their respective positions.  As such, they are

28

                                    22

1    incapable of making an independent or disinterested decision as to whether to initiate suit on

2    behalf of the Company.

3    **B.    The Audit Committee—Individual Defendants Devitre, Lacy, Levinson, and**

4    **Mendoza**

5

6        66.    Individual Defendants Devitre (Chair), Lacy, Levinson, and Mendoza are

7    currently and were members of the Audit Committee during the Relevant Period. As such, they

8    were responsible for "assist[ing] the Board of Directors in fulfilling its oversight responsibilities

9    with respect to," among other things, "the Company's compliance with legal and regulatory

10   requirements."

11

12       67.    As discussed above, the Audit Committee utterly and consciously failed to

13   exercise its oversight responsibilities with respect to the Company's AML program. Despite the

14   known requirement to comply with the BSA and similar laws (*e.g.*, A.R.S. § 13-2317) and

15   implement an AML program, the Board, including the Audit Committee, took no interest and

16   had no involvement in the program, with the exception that the Board approved the Company's

17   Global AML Policy Statement. As such, the Audit Committee systemically failed to implement

18   and oversee adequate internal controls sufficient to review, monitor, and prevent the officers,

19

20   directors, employees, and agents of the Company from violating or acting in contravention to

21   applicable AML laws, rules, and regulations.

22       68.    The Audit Committee's lack of oversight is especially egregious in light of certain

23   "red flags" that were known to it. As stated in the 2010 10-K:

24       Over the past several years, we have entered into consent agreements with federal
25       and state authorities, including the [federal Financial Crimes Enforcement
         Network ("FinCEN")], the New York State Banking Department, the California
26       Department of Financial Institutions and the Arizona Department of Financial
         Institutions, relating to the Bank Secrecy Act and anti-money laundering
27       requirements and related consumer identification matters. These agreements
         required us to pay civil penalties and to take certain measures to enhance our
28       compliance    with   recordkeeping,  reporting, training and agent oversight

23

requirements under applicable state and federal law. *The consent agreements with the New York State Banking Department and the California Department of Financial Institutions were lifted during 2007. However, the financial services industry and businesses like ours continue to be under significant federal and state regulatory scrutiny with respect to the Bank Secrecy Act and anti-money laundering compliance matters.* It is possible that as a result of periodic examinations or otherwise, we could be subject to deficiency findings, fines, criminal penalties, asset seizures or enforcement actions that could adversely affect our business, financial position and results of operations.

The United States Department of Justice served one of our subsidiaries with a grand jury subpoena requesting documents in connection with an investigation into money transfers from the United States to the Dominican Republic during the last several years. The Company is cooperating fully with the DOJ investigation. Due to the stage of the DOJ investigation, the Company is unable to predict the outcome of the investigation or the possible loss or range of loss, if any, associated with the resolution of any charges that may be brought against the Company.

(Emphasis added).

69.     For example, FinCEN determined in 2003 that the Company's "procedures and systems were inadequate to comply with the SAR requirements for reporting structuring because they did not identify all multiple transactions conducted by a customer across agents for a single day," and that the Company's failure to file SARs was willful.  2003 FinCEN Assessment of Civil Money Penalty with Undertakings, Exh. B, at 3-4.  As a result, the Company consented to a civil monetary penalty of $3 million. *Id.,* at 5.

70.     In a related matter, the New York State Department of Banking found in 2002 that the Company failed to aggregate multiple currency transactions totaling more than $10,000 for the purpose of filing currency transaction reports, and the Company agreed to pay a fine of $8 million. *Id.,* at 1-2 & n.1

71.     The $94 million settlement with Arizona was thus one in a string of failures by the Company to comply with applicable AML requirements, which could have been avoided had Individual Defendants Devitre, Lacy, Levinson, and Mendoza not breached their fiduciary duties of good faith and loyalty.

24

72.     The intentional disregard of the aforementioned red flags by Individual Defendants Devitre, Lacy, Levinson, and Mendoza, as embodied by their utter conscious systemic failure to implement and oversee adequate internal controls sufficient to monitor and prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable AML laws, rules, and regulations, constitutes breaches of their duties of good faith and loyalty such that they face a substantial likelihood of personal liability for their actions/inaction.

73.     Because they face a substantial likelihood of personal liability on their part, Individual Defendants Devitre, Lacy, Levinson, and Mendoza cannot impartially consider a demand on the Board to commence litigation against them.

74.     Individual Defendants Devitre, Lacy, Levinson, and Mendoza, along with Individual Defendants Gold and Ersek, constitute six of the eleven members of WUC's Board, an absolute majority, and thus demand is futile.

C.     **The CG Committee—Individual Defendants Holden, Lacy, Miles, and Stevenson**

75.     In addition, as members of the CG Committee, Individual Defendants Holden, Lacy (Chair), Miles, and Stevenson, are currently and were members of the CG Committee during the Relevant Period.[6] As such, they were responsible for "review[ing] and advis[ing] the Board regarding matters of public policy and social responsibility as they relate to the Company," including *"[r]eview[ing] the Company's compliance programs and policies relating to anti-money laundering laws."* The Chairman of the Committee or his or her designee was required to "periodically, but not less frequently than annually . . . provide reports to the Audit

---

[6] Individual Defendant von Schimmelmann also is a member of the CG Committee. Because he did not join the Board and the CG Committee until after the end of the Relevant Period, his actions or inaction *as a member of the CG Committee* need not be considered for the purpose of determining demand futility.

25

Committee of the Board as to the status of and developments in this area."

76.     As discussed above, the CG Committee utterly and consciously failed to exercise its responsibilities to review and monitor the Company's compliance programs and policies relating to known AML requirements.  Despite the known requirement to comply with the BSA and similar laws and implement an AML program, the Board, including the CG Committee, took no interest and had no involvement in the program, with the exception that the Board approved the Company's Global AML Policy Statement.  As such, the CG Committee systemically failed to sufficient to review the Company's compliance programs and policies relating to known AML requirements and monitor their implementation to prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable AML laws, rules, and regulations.

77.     This failure is especially egregious in light of the "red flags" discussed *supra* that were known to the members of the CG Committee.

78.     The intentional disregard of the aforementioned red flags by Individual Defendants Holden, Lacy, Miles, and Stevenson, as embodied by their utter conscious systemic failure to review the Company's compliance programs and policies relating to known AML requirements and monitor their implementation to prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to applicable AML laws, rules, and regulations, constitutes breaches of their duties of good faith and loyalty such that they face a substantial likelihood of personal liability for their actions/inaction.

79.     Because they face a substantial likelihood of personal liability on their part, Individual Defendants Holden, Lacy, Miles, and Stevenson cannot impartially consider a demand on the Board to commence litigation against them.

80.     Individual Defendants Holden, Lacy, Miles, and Stevenson, along with Individual

Defendants Devitre, Levinson, Mendoza, Gold, and Ersek, constitute nine of the eleven members of WUC's Board, an absolute majority, and thus demand is futile. Even if demand somehow is not futile with respect to the members of the Audit Committee, Individual Defendants Holden, Lacy, Miles, and Stevenson, along with Individual Defendants Gold and Ersek, comprise six of the eleven members of WUC's Board, an absolute majority.

**COUNT I**

**Against The Individual Defendants**
**for Breach of Fiduciary Duty**

81.     Based upon the allegations set forth in the preceding paragraphs, the Individual Defendants consciously and systemically failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors, employees, and agents of the Company from violating or acting in contravention to, applicable AML and other legal requirements.

82.     Those Individual Defendants who participated in or had knowledge of the Company's illegal activities and profited thereby acted intentionally, thereby breaching their fiduciary duty of loyalty to the Company.

83.     The Individual Defendants who were directors and/or senior executive officers of the Company abused the trust reposed in them by virtue of their positions and breached their fiduciary duty of loyalty by utterly abdicating their duty of oversight. As the result of their sustained and systematic failure to exercise oversight, the Individual Defendants caused or allowed the Company's business to be conducted in violation of the extensive legal requirements and regulations that were known to them.

84.     By reason of the foregoing, the Individual Defendants have proximately caused injury to the Company, which has been and will continue to be substantially damaged as the foreseeable result of their wrongful acts and omissions. As a result of the misconduct

1   alleged herein, the Individual Defendants are liable to the Company.

2       85.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

3                          **COUNT II**

4                   **Against The Individual Defendants**
5                   **For Waste Of Corporate Assets**

6       86.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully

7   set forth herein.

8       87.   As a result of the Individual Defendants' and the Company's lack of internal

9   controls, and by failing to properly consider the interests of the Company and its public

10  shareholders by failing to conduct proper supervision, the Individual Defendants have caused the

11
12  Company to waste valuable corporate assets by, among other things, incurring millions of dollars

13  of legal liability and/or expenses to investigate, defend, and resolve the proceedings in Arizona

14  leading to the Settlement Agreement arising from the Individual Defendants' wrongful actions.

15      88.   As a result of the waste of corporate assets, the Individual Defendants are liable to

16  the Company.

17
18      89.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

19                       **PRAYER FOR RELIEF**

20  WHEREFORE, Plaintiff prays for relief and judgment, as follows:

21      A.    Declaring that the directors and officers named as Individual Defendants herein

22  have breached their fiduciary duties as alleged herein;

23      B.    Requiring the Individual Defendants to pay to the Company the amounts by

24  which it has been damaged or will be damaged by reason of the conduct complained of herein;

25      C.    Requiring the Individual Defendants to remit to the Company all of their salaries

26  and other compensation received for the periods when they breached their duties;

27      D.    Ordering that the Individual Defendants and those under their supervision and

28

                              28

1   control, refrain from the commission of such further unlawful activities as are alleged herein, and

2   implement comprehensive corrective measures including a system of internal controls and

3   procedures sufficient to prevent the repetition of the acts complained of herein which will rectify

4   all such wrongs as have been committed and prevent their recurrence;

5         E.      Awarding to Plaintiff the costs and disbursements of the action, including

6   reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

7

8         F.      Granting such other and further relief as the Court deems just and proper.

9   **JURY DEMAND**

10  Plaintiff demands a trial by jury.

11  Dated: September _23_, 2010            **WARD, KEENAN & BARRETT, P.C.**

12

13              By: _____

14                 Gerald Barrett, State Bar No. 5855
               2838 N. Central Avenue, Suite 1720

15                 Phoenix, AZ 85012
               Tel.: (602) 279-1717

16                 Fax: (602) 279-8908
               gbarrett@wardkeenenbarrett.com

17

18                 **RIGRODSKY & LONG, P.A.**
               Seth D. Rigrodsky

19                 Brian D. Long
               919 N. Market Street, Suite 980

20                 Wilmington, Delaware 19801
               Tel.: (302) 295-5310

21                 Fax: (302) 654-7530

22                 **EGAN YOUNG**
               Eric L. Young

23                 562 Township Line Road, Suite 100
               Blue Bell, Pennsylvania 19422

24                 Tel.: (215) 367-5151
               Fax: (215) 367-5143

25

26                 *Attorneys for Plaintiff*

27

28

29

MICHAEL K. JEANES, CLERK
BY D Stephens DEP
FILED

10 SEP 23 PM ⊭ 59

1   **WARD, KEENAN & BARRETT, P.C.**
Gerald Barrett, State Bar No. 5855
2   3838 North Central Ave., Suite 1720
Phoenix, Arizona  85012
3   Tel: (602) 279-1717
Fax: (602) 279-8908
4   gbarrett@wardkeenenbarrett.com

5   **RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky *Pro Hac Vice application pending*
6   Brian D. Long *Pro Hac Vice application pending*
7   919 N. Market Street, Suite 980
Wilmington, Delaware  19801
8   Tel.: (302) 295-5310
Fax: (302) 654-7530
9
**EGAN YOUNG**
10   Eric L. Young *Pro Hac Vice application pending*
562 Township Line Road, Suite 100
11   Blue Bell, Pennsylvania 19422
Tel.: (215) 367-5151
12   Fax: (215) 367-5143
13   Attorneys for Plaintiff

14              **SUPERIOR COURT OF ARIZONA**
                  **COUNTY OF MARICOPA**
15

16   U.F.C.W. LOCAL 1776 & PARTICIPATING          )
EMPLOYERS PENSION FUND, derivatively on      )
17   behalf of The Western Union Company,         )       CV2010-027712
                                                  )
18                      Plaintiff,                )   No._____
                                                  )
19          vs.                                   )
                                                  )
20   DINYAR S. DEVITRE, HIKMET ERSEK,             )
CHRISTINA A. GOLD, JACK M. GREENBERG,        )   **CERTIFICATE OF**
21   BETSY D. HOLDEN, ALAN J. LACY, LINDA         )   **COMPULSORY**
FAYNE LEVINSON, ROBERTO G. MENDOZA,          )   **ARBITRATION**
22   MICHAEL A. MILES, JR., LORD DENNIS           )
STEVENSON, WULF VON SCHIMMELMANN,            )
23                                                )
24                      Defendants,               )
                                                  )
25          and                                   )
                                                  )
26   THE WESTERN UNION COMPANY, and               )
WESTERN UNION FINANCIAL SERVICES, INC.,      )
27                                                )
                   Nominal Defendants.            )
28

1   The undersigned certifies that the largest award sought by the complainant, including

2   punitive damages, but excluding interest, attorneys' fees, and costs does exceed limits set by

3   Local Rule for compulsory arbitration.  This case is not subject to the Uniform Rules of

4   Procedure for Arbitration.

5   Dated: September 23, 2010          **WARD, KEENAN & BARRETT, P.C.**

6                                      By:

7                                      Gerald Barrett, State Bar No. 5855
                                       3838 N. Central Avenue, Suite 1720
8                                      Phoenix, AZ 85012
                                       Tel.: (602) 279-1717
9                                      Fax: (602) 279-8908
                                       gbarrett@wardkeenenbarrett.com
10
                                       **RIGRODSKY & LONG, P.A.**
11                                     Seth D. Rigrodsky
                                       Brian D. Long
12                                     919 N. Market Street, Suite 980
                                       Wilmington, Delaware 19801
13                                     Tel.: (302) 295-5310
                                       Fax: (302) 654-7530
14
15                                     **EGAN YOUNG**
                                       Eric L. Young
16                                     562 Township Line Road, Suite 100
                                       Blue Bell, Pennsylvania 19422
17                                     Tel.: (215) 367-5151
                                       Fax: (215) 367-5143
18
19                                     *Attorneys for Plaintiff*

20

21

22

23

24

25

26

27

28

2

ORIGINAL

1

2       **SUPERIOR COURT OF ARIZONA**
        **COUNTY OF MARICOPA**

3   U.F.C.W. LOCAL 1776 & PARTICIPATING          )
4   EMPLOYERS PENSION FUND, derivatively on       )
    behalf of The Western Union Company,          )
5                                                 )
                    Plaintiff,                    )    No. CV2010-027712
6                                                 )
                        vs.                       )
7                                                 )
    DINYAR S. DEVITRE, HIKMET ERSEK,             )
8   CHRISTINA A. GOLD, JACK M. GREENBERG,        )
    BETSY D. HOLDEN, ALAN J. LACY, LINDA         )
9   FAYNE LEVINSON, ROBERTO G. MENDOZA,          )
    MICHAEL A. MILES, JR., LORD DENNIS           )
10  STEVENSON, WULF VON SCHIMMELMANN,            )
                                                 )
11                  Defendants,                   )
                                                 )
12                     and                        )
                                                 )
13  THE WESTERN UNION COMPANY, and               )
14  WESTERN UNION FINANCIAL SERVICES, INC.,      )
                                                 )
15              Nominal Defendants.               )

16

17                      **VERIFICATION**

18      I, Regina Reardon, declare as follows:

19          1.      My name is Regina Reardon. I am the Fund Administrator of the U.F.C.W. Local

20  1776 & Participating Employers Pension Fund ("UFCW Fund"). I make this Verification in

21

22  connection with the filing of the shareholder double derivative complaint in the above-captioned

23  action (the "Complaint").

24          2.      I am authorized to make legal decisions on behalf of the UFCW Fund and I am

25  authorized to make this Verification on the UFCW Fund's behalf.

26          3.      The UFCW Fund has been and remains a shareholder of The Western Union

27  Company, from January 13, 2004 to the present.

28

1        4.     I verify that I have reviewed the foregoing Complaint and that the allegations as

2  to the UFCW Fund and its own actions are true and correct and all other allegations upon

3  information and belief are true and correct.

4        I make this Verification under penalty of perjury that the foregoing is true and correct.

5        Executed this 23rd day of September, 2010.

6

7

8                                     Regina Reardon

9                                     As Fund Administrator of the U.F.C.W. Local
                                  1776 & Participating Employers Pension Fund

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Michelle Paigen
Filing ID 696387
9/29/2010 1:57:27 PM

1    **WARD, KEENAN & BARRETT, P.C.**
     Gerald Barrett, State Bar No. 5855
2    3838 North Central Ave., Suite 1720
     Phoenix, Arizona  85012
3    Tel: (602) 279-1717
     Fax: (602) 279-8908
4    gbarrett@wardkeenenbarrett.com

5    **RIGRODSKY & LONG, P.A.**
     Seth D. Rigrodsky *Pro Hac Vice application pending*
6    Brian D. Long *Pro Hac Vice application pending*
7    919 N. Market Street, Suite 980
     Wilmington, Delaware  19801
8    Tel.: (302) 295-5310
     Fax: (302) 654-7530
9
     **EGAN YOUNG**
10   Eric L. Young *Pro Hac Vice application pending*
     562 Township Line Road, Suite 100
11   Blue Bell, Pennsylvania  19422
     Tel.: (215) 367-5151
12   Fax: (215) 367-5143
     Attorneys for Plaintiff
13

14                **SUPERIOR COURT OF ARIZONA**
                 **COUNTY OF MARICOPA**
15

16   U.F.C.W. LOCAL 1776 & PARTICIPATING      )
     EMPLOYERS PENSION FUND, derivatively on   )
17   behalf of The Western Union Company,       )
                                     )
18                 Plaintiff,     )  No.CV2010-027712
                                       )
19           vs.                  )
                                       )
20   DINYAR S. DEVITRE, HIKMET ERSEK,      )  NOTICE OF FILING
     CHRISTINA A. GOLD, JACK M. GREENBERG,   )  ORIGINAL VERIFICATION
21   BETSY D. HOLDEN, ALAN J. LACY, LINDA   )  OF REGINA REARDON
     FAYNE LEVINSON, ROBERTO G. MENDOZA,   )
22   MICHAEL A. MILES, JR., LORD DENNIS     )
     STEVENSON, WULF VON SCHIMMELMANN,    )
23                                        )
                Defendants,     )
24                                        )
              and                )
25                                        )
     THE WESTERN UNION COMPANY, and       )
26   WESTERN UNION FINANCIAL SERVICES, INC.,   )
27                                        )
              Nominal Defendants.    )
28

1   Notice is hereby given that plaintiff has this date hand-filed with the Superior Court the

2   original verification of Regina Reardon.

3   Dated: September 29, 2010        **WARD, KEENAN & BARRETT, P.C.**

4                                    By: *S/GERALD BARRETT*

5                                       Gerald Barrett, State Bar No. 5855
                                        3838 N. Central Avenue, Suite 1720
6                                       Phoenix, AZ 85012
                                        Tel.: (602) 279-1717
7                                       Fax: (602) 279-8908
                                        gbarrett@wardkeenenbarrett.com
8
                                     **RIGRODSKY & LONG, P.A.**
9                                       Seth D. Rigrodsky
                                        Brian D. Long
10                                      919 N. Market Street, Suite 980
                                        Wilmington, Delaware 19801
11                                      Tel.: (302) 295-5310
                                        Fax: (302) 654-7530
12

13                                   **EGAN YOUNG**
                                        Eric L. Young
14                                      562 Township Line Road, Suite 100
                                        Blue Bell, Pennsylvania 19422
15                                      Tel.: (215) 367-5151
                                        Fax: (215) 367-5143
16

17                                   *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

26

27

28

2

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Lori Cummings
Filing ID 716581
10/26/2010 3:09:07 PM

1   David F. Graham
    Sidley Austin LLP
2   One South Dearborn
    Chicago, Illinois 60603
3   (312) 853-7596
    (312) 853-7036 fax
    dgraham@sidley.com
4   Attorney for Certain Defendants

5

6                    **SUPERIOR COURT OF ARIZONA**
7                       **COUNTY OF MARICOPA**

8   U.F.C.W. LOCAL 1776 & PARTICIPATING        )
    EMPLOYERS PENSION FUND, derivatively on     )
9   behalf of The Western Union Company,        )
                                                )
10                           Plaintiff,         )   No.CV-2010-027712
                                                )
11          vs.                                 )
                                                )
12  DINYAR S. DEVITRE, HIKMET ERSEK,            )   **WAIVER OF SERVICE BY**
    CHRISTINA A. GOLD, JACK M. GREENBERG,       )   **CERTAIN DEFENDANTS**
13  BETSY D. HOLDEN, ALAN J. LACY, LINDA        )
    FAYNE LEVINSON, ROBERTO G. MENDOZA,         )
14  MICHAEL A. MILES, JR., LORD DENNIS          )
15  STEVENSON, WULF VON SCHIMMELMANN,           )
                                                )
16                           Defendants,        )
                                                )
17          and                                 )
                                                )
18  THE WESTERN UNION COMPANY, and              )
19  WESTERN UNION FINANCIAL SERVICES, INC.,     )
                                                )
20                   Nominal Defendants.        )

21

22  TO: Seth D. Rigrodsky

23          I acknowledge receipt of your request that I waive service of a summons in the

24  above referenced action and case number in the Superior Court of the State of Arizona in

    and for the County of Maricopa. I also have received a copy of the complaint in the
25
    action, two copies of this instrument, and a means by which I can return the signed
26
    waiver to you without cost to me.
27
            I agree to save the cost of service of a summons and an additional copy of the
28

1   complaint in this lawsuit by not requiring that Dinyar S. Devitre, Hikmet Ersek, Christina

2   A. Gold, Jack M. Greenberg, Betsy D. Holden, Alan J. Lacy, Linda Fayne Levinson,

3   Roberto G. Mendoza and Mr. Michael A. Miles be served with judicial process in the

4   manner provided by the Arizona Rules of Civil Procedure.

5        Dinyar S. Devitre, Hikmet Ersek, Christina A. Gold, Jack M. Greenberg, Betsy D.

6   Holden, Alan J. Lacy, Linda Fayne Levinson, Roberto G. Mendoza and Mr. Michael A.

7   Miles will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of

8   the court except for objections based on a defect in the summons or in the service of the

9   summons.

10       I understand that a judgment may be entered against Dinyar S. Devitre, Hikmet

11   Ersek, Christina A. Gold, Jack M. Greenberg, Betsy D. Holden, Alan J. Lacy, Linda

12   Fayne Levinson, Roberto G. Mendoza and Mr. Michael A. Miles if an answer or motion

13   under Rule 12 is not served upon you within sixty (60) days after October 14, 2010.

14       Dated this _19th_ day of October 2010.

15

16                   David F. Graham

                      Sidley Austin LLP

17                   One South Dearborn

                      Chicago, Illinois 60603

18                   (312) 853-7596

                      (312) 853-7036 fax

19                   dgraham@sidley.com

20

           DUTY TO AVOID UNNECESSARY COSTS OF SERVICE OF SUMMONS

21

22       Rule 4.1 and Rule 4.2 of the Arizona Rules of Civil Procedure require certain parties to cooperate in saving unnecessary costs of service of the summons and a pleading. A defendant located in the United States who, after

23   being notified of an action and asked by a plaintiff located in the United States to waive service of a summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return the waiver.

24       It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought in an improper place or in a court that lacks jurisdiction over the subject matter of

25   the action or over its person or property. A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later object to the

26   jurisdiction of the court or to the place where the action has been brought.

      A defendant who waives service must, within the time specified on the waiver form, serve on the plaintiff's

27   attorney (or unrepresented plaintiff) a response to the complaint and also must file a signed copy of the response with the court. If the answer or motion is not served within this time, a default judgment may be taken against that

28   defendant. By waiving service, a defendant is allowed more time to answer than if the summons had been actually served when the request for waiver of service was received

                                      2

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Michelle Paigen
Filing ID 718170
10/28/2010 9:21:49 AM

1  STEPTOE & JOHNSON LLP
   Collier Center
2  201 East Washington Street, Suite 1600
   Phoenix, Arizona 85004-2382
3  Telephone: (602) 257-5200
   Facsimile: (602) 257-5299
4  Court E-Mail: phcourtnotices@steptoe.com

5  Karl M. Tilleman (013435)

6  Attorneys for Nominal Defendants

7              SUPERIOR COURT OF ARIZONA
                    MARICOPA COUNTY
8

9  U.F.C.W.   LOCAL   1776   &   )   No. CV2010-027712
   PARTICIPATING   EMPLOYERS   )
   PENSION FUND, derivatively on behalf   )
10 of The Western Union Company,   )

11            Plaintiff,   )
                            )   **WAIVER OF SERVICE BY
12      vs.                 )   CERTAIN DEFENDANTS**

13 DINYAR  S.  DEVITRE,  HIKMET   )
   ERSEK, CHRISTINA A. GOLD, JACK   )
14 M.   GREENBERG,   BETSY   D.   )
   HOLDEN, ALAN J. LACY, LINDA   )
15 FAYNE  LEVINSON,  ROBERTO  G.   )
   MENDOZA, MICHAEL  A.  MILES,   )
16 JR.,  LORD  DENNIS  STEVENSON,   )
   WULF VON SCHIMMELMANN,   )

17            Defendants,   )

18      And   )

19 THE  WESTERN UNION COMPANY,   )
   and   WESTERNUNION   FINANCIAL   )
20 SERVICES, INC.,   )

21            Nominal Defendants.   )

22 TO:  Seth D. Rigrodsky

23      I acknowledge receipt of your request that I waive service of a summons in the

24 above referenced action and case number in the Superior Court of the State of Arizona

25 in and for the County of Maricopa.  I also have received a copy of the complaint in the

26 action, two copies of this instrument, and a means by which I can return the signed

27 waiver to you without cost to me.

28

Doc. #609224 v.1

1       I agree to save the cost of service of a summons and an additional copy of the

2   complaint in this lawsuit by not requiring that THE WESTERN UNION COMPANY,

3   and WESTERN UNION FINANCIAL SERVICES, INC., be served with judicial

4   process in the manner provided by the Arizona Rules of Civil Procedure.

5       THE WESTERN UNION COMPANY, and WESTERN UNION FINANCIAL

6   SERVICES, INC., will retain all defenses or objection to the lawsuit or to the

7   jurisdiction or venue of the court except for objections based on a defect in the summons

8   or in the service of the summons.

9       I understand that a judgment may be entered against THE WESTERN UNION

10  COMPANY, and WESTERN UNION FINANCIAL SERVICES, INC., if an answer or

11  motion under Rule 12 is not served upon you within sixty (60) days after October 26,

12  2010.

13      DATED this 26th day of October, 2010.

14            STEPTOE & JOHNSON LLP

15

16            By

17              Karl M. Tilleman
            Collier Center

18              201 East Washington Street, Suite 1600
            Phoenix, Arizona 85004-2382

19            Attorneys for Nominal Defendants

20

21         DUTY TO AVOID UNNECESSARY COSTS OF SERVICE OF SUMMONS

22      Rule 4.1 and Rule 4.2 of the Arizona Rules of Civil Procedure require certain parties to cooperate in saving unnecessary costs of service of the summons and a pleading. A defendant located in the United States who, after being notified of an action and asked by a plaintiff located in the United States to waive service of a summons, fails to do so

23  will be required to bear the cost of such service unless good cause be shown for its failure to sign and return the waiver.
    It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the

24  action has been brought in an improper place or in a court that lacks jurisdiction over the subject matter of the action or over its person or property. A party who waives service of the summons retains all defenses and objections (except any

25  relating to the summons or to the service of the summons), and may later object to the jurisdiction of the court or to the place where the action has been brought.

26      A defendant who waives service must, within the time specified on the waiver form, serve on the plaintiff's attorney (or unrepresented plaintiff) a response to the complaint and also must file a signed copy of the response with the

27  court. If the answer or motion is not served within this time, a default judgment may be taken against that defendant. By waiving service, a defendant is allowed more time to answer than if the summons had been actually served when the

28  request for waiver of service was received.

                    Doc. #609224 v.1